FORT BEND INDEPENDENT SCHOOL DISTRICT, et al., Plaintiffs-Appellees,

v.

CITY OF STAFFORD, et al., Defendants-Appellants.

No. 80–1635.

United States Court of Appeals, Fifth Circuit. Unit A

July 30, 1981.

Olson & Olson, William A. Olson, Houston, Tex., Charles L. Michulka, Stafford, Tex., for defendants-appellants.

Reynolds, Allen & Cook, Michael K. Swan, Hoover, Cox & Miller, Dermot Rigg, Houston, Tex., for plaintiffs-appellees.

Before BROWN, WISDOM and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This appeal brings before us for the second time one of the more unusual lawsuits spawned by the lengthy process of school desegregation in this circuit. In this case the Fort Bend Independent School District (FBISD), which has never been the defendant in a desegregation suit or the subject of a court-ordered desegregation plan, has come into court in the posture of a plaintiff seeking a judicial determination that despite FBISD's longstanding and good faith efforts to dismantle its segregated school system, the district has not yet purged itself of all vestiges of its former discriminatory practices. FBISD contends that because its school system remains tainted by discrimination, the efforts of the town of Stafford to establish a new school district encompassing that part of FBISD located within the town should be enjoined under *Wright v. Council of the City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), and *United States v. Scotland Neck City Board of Education*, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed. 75 (1972). On the first appeal of this case, we reversed the district court's order enjoining the establishment of the Stafford Municipal School District and remanded the case for a determination of the question whether FBISD had attained unitary status. *Fort Bend Independent School District v. City of Stafford*, 594 F.2d 73 (5th Cir. 1979). In the course of proceedings on remand, the parties stipulated that FBISD had been a unitary school system since the academic year 1969–70 in all respects except in the area of employment of minority faculty members and professional staff. The evidence introduced at the hearing before the district court following our remand was, therefore, confined to the question whether FBISD had adequately remedied past racial discrimination in the employment of teachers and other professional personnel.

The relevant aspects of the record developed on remand may be summarized briefly. During the academic year 1964–65 immediately preceding the commencement of FBISD's desegregation efforts, the district employed 36 minority teachers, who formed approximately 18% of the district's faculty. All but one of these teachers were black. The number of black teachers employed by the district declined markedly in the next few years. By the academic year 1968–69, the first year in which FBISD operated no one-race schools, the district employed only 24 black teachers; these teachers constituted about 9.8% of the district's faculty. Although the faculty of the district grew substantially during the decade following the 1964–65 school year, the number of black teachers employed by the FBISD continued to decline, both in terms of absolute numbers and as a percentage of the district's faculty, through the academic year 1974–75. A number of black teachers were also demoted during the period immediately following desegregation.

At the hearing following our remand of this case, Lawrence Elkins, superintendent of FBISD, testified as to the circumstances surrounding the departures and demotions

of black teachers formerly employed by FBISD. Mr. Elkins testified that at the time the district's desegregation plan was implemented, district officials generally perceived black teachers formerly assigned to black schools to be unqualified to assume equivalent positions in desegregated schools. Although Mr. Elkins denied that this perception reflected racial prejudice, he acknowledged that the district's administrative officers generally believed the black teachers were inferior because of the education and training they had received in segregated schools. Mr. Elkins' testimony indicated that a number of black teachers employed by FBISD at the time desegregation began may have been indirectly pressured to resign or retire from the district because of their awareness that the district would not consider them qualified for equivalent positions in the desegregated schools.[1]

Mr. Elkins further testified that in the years immediately following desegregation, FBISD did not formally recruit applicants for teaching positions in the district by interviewing at colleges or universities. Mr. Elkins would seek applicants primarily by requesting referrals from his friends and colleagues in education. Mr. Elkins acknowledged that since most of his professional acquaintances were white, this process produced few minority applications for teaching positions in FBISD.

Beginning in 1973, these practices changed. In that year FBISD established an affirmative action program designed to increase the number of minority teachers and administrative personnel employed by the district. In that year the district also hired a personnel director and began an organized recruiting program at teacher training institutions. Although at first, the district concentrated on large colleges and universities, FBISD later began visiting a number of smaller schools having predominantly minority enrollments. In 1976, find-

ing that the district was still having difficulty attracting large numbers of minority applicants, FBISD promoted one of its black employees, an elementary school principal, to the position of Administrative Assistant for Personnel and placed this person in charge of the minority recruitment program. FBISD has also made plans to coordinate a student teacher program with a nearby college having a predominantly minority student body.

The testimony of several other persons familiar with techniques of recruiting educational personnel indicated that FBISD's current employment practices were non-discriminatory and consistent with recommended techniques for sound affirmative action programs. These witnesses generally attributed FBISD's difficulty in actually increasing the percentage of minority teachers employed in the district to factors outside the district's control: competition for talented minorities from other public and private employers and FBISD's suburban location which often means that a minority employee must relocate or commute a substantial distance.

■ On this record, the district court found nothing in the evidence involving FBISD's faculty assignment practices to indicate that the district's assignment of minority faculty members resulted in any racially identifiable schools. Although the court found that there were "slight maldistributions" revealed by the statistics concerning minority faculty, the court concluded that:

> In no instance is the percentage of minority personnel so high or so low that the school is identifiable as a minority or black school .... Thus ... the slightly uneven distribution of certified personnel does not preclude unitary status in the areas of faculty and staff.

The district court did, however, find that the percentage of minorities employed on

---

1. Mr. Elkins stated: "I think that we probably encouraged [some of the black teachers] in their own minds to retire because what was happening was just as visible to them as anyone else." He also admitted that the "end result" of the district's practices during this period was that black teachers were encouraged to resign in order to avoid demotion or were demoted because they were black. Record, Vol. 7 at 90–91.

the faculty of FBISD was significantly less than the percentage of minority students enrolled in FBISD schools. The court found that although approximately 36% of FBISD's enrollment consisted of minority students, only 12.14% of the certified personnel (administrators, teachers, principals, counselors, etc. ...) were black, Mexican-American or members of other "minority" groups. Reasoning that in order for a school district to attain unitary status "the percentage of minority faculty must be approximately the same as the percentage of minority students," the district court concluded that the disparity between the percentage of minority teachers employed by FBISD and the percentage of minority students enrolled in the district prevented a determination that FBISD had achieved unitary status. Concluding that the establishment of a separate Stafford school district would "severely hinder" FBISD's efforts to reach this goal, the district court issued an injunction prohibiting the creation of the Stafford district. On this second appeal, Stafford urges that the district court applied an incorrect legal standard in its analysis of the question whether FBISD had sufficiently erased the effects of its prior discriminatory practices in the area of employment of faculty and other professional personnel to be deemed unitary; we agree and reverse.

The district court held that in order for a school district which has formerly operated a dual school system to attain unitary status, "the percentage of minority faculty must be approximately the same as the percentage of minority students." As authority for this requirement both the district court and FBISD cite *United States v. Texas Education Agency*, 467 F.2d 848 (5th Cir. 1972). Although our opinion in that case did direct the school board to "attempt to employ more Mexican-American teachers with the goal of attaining a ratio of Mexican-American teachers within the faculty that reflects more truly the ratio of Mexican-American students to the total population," 467 F.2d at 873, we did not hold that as a general rule such a ratio must be attained or maintained in order for a school

district to be declared unitary. In that part of our opinion dealing with the faculty and professional staff of the Austin schools, we indicated that our principal concern was to fulfill meaningfully the mandate of *United States v. Montgomery County Board of Education*, 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969). The Supreme Court's opinion in *Montgomery County* approved a district court's remedial order which set forth a specific schedule for desegregation of school faculties designed to achieve the goal of having a ratio of black to white teachers in each school that was substantially the same as the ratio of black to white teachers in the school system as a whole; it made no reference to hiring or employment quotas. Nor did we adopt any such quotas in *United States v. Texas Education Agency, supra*, as a prerequisite to a determination of unitary status. In the Austin school system which we examined in *Texas Education Agency*, the number of Mexican-American teachers was so small that it was impossible to distribute them in any meaningful way throughout the system. Thus in order to apply the mandate of the Supreme Court's opinion in *Montgomery County, supra*, we required the school district to undertake an affirmative action program designed to recruit Mexican-American teachers; we did not, however, hold that the district must acquire and maintain a faculty with a racial composition mirroring that of the student body in order to remedy all vestiges of an unlawful dual school system and attain unitary status. Indeed we emphasized that:

> A showing of a good faith effort to find sufficient qualified Mexican-American teachers to achieve an equitable ratio, will rebut any inference of discrimination. The ultimate goal is to apply the faculty rule laid down in *United States v. Montgomery County Board of Education*.

467 F.2d at 873.

Our own research has disclosed no cases in which we have required a school district, as a prerequisite to attaining unitary status, to employ a faculty having the same racial composition as the student body. In-

deed we have only recently had occasion to reiterate the admonition of the Supreme Court in *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), that comparisons between the racial composition of a district's teacher work force and its student population are not determinative of the question whether the district discriminates in the employment of faculty members. *Castaneda v. Pickard*, 648 F.2d 989, 1002–1003 (5th Cir. 1981). Although "faculty and staff desegregation [is] . . . an important aspect of the basic task of achieving a public school system wholly free from racial discrimination," *United States v. Montgomery County Board of Education, supra,* 395 U.S. at 231–232, 89 S.Ct. at 1674, a formerly segregated school system need not employ a faculty having a racial composition substantially equivalent to that of its student body in order effectively to desegregate its schools and attain unitary status. The district court erred in imposing such a requirement.

On appeal, FBISD urges that even if we find error in the district court's analysis, that court's judgment should be affirmed because its conclusion that FBISD had not yet become unitary in the area of faculty and staff is a correct one when considered in light of standards we enunciated in *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1969) (en banc), rev'd in part sub nom. *Carter v. West Feliciana Parish School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970) (reversal limited to timing of desegregation). *Singleton* enunciated three principles to govern the faculty employment practices of a school district during the desegregation process. First, *Singleton*, like *United States v. Montgomery County Board, supra,* required that "principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial composition of a staff indicate that a school is intended for Negro students or white students," 419 F.2d at 1218. FBISD's compliance with this requirement is not disputed. Second, *Singleton* prohibited discrimination on the basis of race, color or national origin in the hiring, assignment, promotion, pay, demotion or dismissal of faculty members and administrative staff. The third principle enunciated in *Singleton* affecting the employment practices of school districts in the process of converting from a dual to a unitary system was a more limited remedial measure. *Singleton* provided that in school districts where the process of desegregation effected a reduction in the number of teachers or other professionals employed by the district, the school district must select the staff members to be dismissed or demoted on the basis of objective and reasonable non-discriminatory standards from among all the staff of the district and must make later vacancies available to qualified staff members dismissed or demoted during desegregation before filling such positions with a person of a race, color or national origin different from that of the staff member previously dismissed or demoted. FBISD contends that because the absolute number of minority teachers employed by the district decreased during the early years of desegregation and because the percentage of FBISD's current faculty consisting of minority teachers is less than the percentage of minority teachers employed at the time the district's desegregation effort began, FBISD is in violation of the second and third mandates of *Singleton* and cannot be deemed unitary. We think these arguments misread *Singleton* and its progeny.

■ FBISD urges that this third aspect of our *Singleton* decree, which creates a limited preference for employees demoted or dismissed as a result of desegregation related reductions in staff, establishes a requirement that in the process of conversion from a dual to a unitary system, a school district must maintain, as a minimum, a percentage of minority faculty members equivalent to that it employed prior to desegregation. Under this theory, since black teachers formed approximately 18% of the faculty of FBISD on the eve of the district's desegregation effort and now form only about 8.6%, FBISD cannot be declared unitary. *Singleton's* reinstatement prefer-

ence provision cannot, however, fairly be read to impose such a requirement on FBISD.

■ At the outset, we note that our cases have consistently stated that *Singleton's* reinstatement preference is a limited remedial device designed to deal with only one of many problems encountered in the course of dismantling a dual school system—the problem of fewer faculty and administrative positions being available in many school districts as a result of the merger of formerly segregated schools. "The application of *Singleton's* dismissal and demotion standards is limited to the particular problem of a smaller faculty caused by school desegregation." *Lee v. Russell County Board of Education,* 563 F.2d 1159, 1161 (5th Cir. 1977). Cognizant of the principle that "rules do not run beyond the reasons which occasion them," *Wright v. Houston Independent School District,* 569 F.2d 1383, 1384 (5th Cir. 1978), we have repeatedly held that *Singleton's* reinstatement preference proviso applies only in cases where a school district reduces the total number of faculty or administrative positions in its schools as a result of desegregation. *Cousin v. Board of Trustees,* 648 F.2d 293 (5th Cir. 1981) (in order for *Singleton's* reinstatement preference proviso to apply "there must be a desegregation-related reduction in personnel resulting in a demotion or dismissal"); *Wright v. Houston Independent School District, supra* ("The law of the question is now clear that it is a desegregation related general reduction in force that triggers *Singleton's* application."); *Barnes v. Jones County School District,* 544 F.2d 804 (5th Cir. 1977) (unless there is an overall reduction in force as a result of desegregation, a dismissed or demoted faculty member cannot claim right to reinstatement under *Singleton*); *Pickens v. Okolona Municipal Separate School District,* 527 F.2d 358, 361 (5th Cir. 1976) ("[T]his court did not intend that the strict requirements of *Singleton* apply in the absence of desegregation related reductions.") Even if a school district in the process of desegregation reduces the number of minorities on its faculty while increasing the total number of faculty it employs, the particular provision of *Singleton* governing reinstatement of employees affected by desegregation-related dismissals and demotions does not apply. *Barnes v. Jones County School District, supra.*

■ There was no reduction in the faculty or professional staff employed by FBISD as a result of the district's desegregation efforts. Indeed, the process of desegregation in the FBISD has been contemporaneous with a period of remarkable population growth in the district which has prompted dramatic increases in enrollment, construction of several new school facilities and rapid expansion of the faculty. From 1964–65, when FBISD began its desegregation efforts, until the 1979–80 school year, the size of the district's faculty and professional administrative staff increased every year. In the 1979–80 school year, FBISD employed 964 teachers and other certified personnel, an increase of 396% over the 194 professional staff employed in 1964–65. Under these circumstances the fact that the number of minority teachers employed by FBISD declined in absolute numbers in the years immediately following 1964–65 and remains, in percentage terms, less than that employed in 1964–65 does not place the district in violation of the *Singleton* provision governing desegregation related dismissals and demotions.

■ We also reject the argument that this provision of *Singleton* establishes a racial quota for the faculty and professional staff of a school district determined by reference to the racial composition of the district's faculty before desegregation began. This aspect of the *Singleton* opinion was designed to ease the inevitably harsh impact of desegregation related reductions in a district's work force on the individual employees affected by such reductions. It provides such persons a right to be offered positions which subsequently become available in the district before such positions are offered to persons of another race, color or national origin. If, however, the former employee declines an offer of reemployment

in a position equivalent to the one he or she previously occupied, nothing in this aspect of *Singleton* precludes the school district from then offering the position to a person of a different race. Thus, this right of first refusal established to protect the rights of particular employees of a school· district does not establish a fixed minimum quota for minority employment, either in terms of a requirement that a school district maintain the same absolute number of minority employees it had before desegregation, or in terms of maintaining a fixed percentage of minority employees determined by reference to figures existing before desegregation. *United States v. Wilcox County Board of Education,* 494 F.2d 575, 579 (5th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974) ("No decision of this court requires that the teachers in any system or at any school be maintained at any arbitrary ratio."); *Lee v. Macon County Board of Education,* 482 F.2d 1253, 1254 (5th Cir. 1973) ("The faculty desegregation requirement of *Singleton* did not '. . . contemplate freezing the faculty ratio which is present when faculty desegregation takes place in the system.' ") (quoting *Carter v. West Feliciana Parish School Board,* 432 F.2d 875, 878 (5th Cir. 1970)).

■ The proper inquiry to be undertaken in an effort to determine whether the FBISD is now unitary is two-fold: first, the district's current employment practices must be non-discriminatory and in compliance with constitutional standards; second, the adverse effects of any earlier, unlawful employment practices must have been adequately remedied. There is nothing in the record of this case to suggest that FBISD's current employment practices are in any way constitutionally deficient. The record does contain, however, evidence that FBISD's employment practices in the period immediately following the implementation of the district's desegregation plan may have been tainted by unlawful discrimination. The record suggests that the substantial number of resignations and retirements of black teachers on the heels of desegregation may not have been the product of free choice but in fact the result of

pressure placed on these employees by FBISD administrators who perceived the black teachers to be inferior and conveyed to the black teachers the message that there would be no place for them in a desegregated system. Assuming, arguendo, that such actions by the district's administrative officials constituted unlawful racial discrimination, however, the record in this case gives every indication that such violations have been adequately remedied by the non-discriminatory employment practices and affirmative action programs which FBISD adopted in 1973 and which FBISD has employed and, indeed, enhanced since that date.

Because FBISD is growing so rapidly, the results of its non-discriminatory employment practices and affirmative action program do not appear dramatic when the racial composition of the faculty is examined in percentage terms. For example, between the 1976–77 academic year and the 1979–80 year, the number of black teachers employed by FBISD increased by only 2.5%. During the same period, however, the number of teachers employed by the district increased from 634 to 964; while the percentage increase in the number of black teachers appears small, in fact, the district employed more than twice as many black teachers in 1979–80 as in 1976–77. There is no allegation here that these present practices are not being implemented in good faith or that FBISD's failure to employ a larger percentage of minority teachers is the result of any current discrimination.

■ Under these circumstances, we think it clear that FBISD has made, at least since 1973, the type of sustained good faith effort to recruit minority faculty members so as to remedy the effects of any past discriminatory practices that we required in *United States v. Texas Education Agency, supra,* and we do not think that the fact that the district may have a smaller percentage of minority faculty than minority students or the fact that the district now has a smaller percentage of minority faculty than it did before desegregation means that the racial

composition of the FBISD faculty precludes a determination that it is a unitary school district. Designating a school district as unitary does not in any way make it immune from future constitutional challenges or judicial scrutiny of its employment practices. If at some point in the future FBISD fails to continue to employ non-discriminatory employment practices, persons adversely affected by such conduct may seek relief in the courts. A declaration of unitary status means only that the district has effectively carried out the mandate of *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*), and its progeny by erasing the vestiges of its unlawful dual school system. Try as it may, FBISD cannot deny its success.

The judgment of the district court is reversed, and the case is remanded to the district court with instructions to vacate the injunction and to enter judgment for the defendants.

REVERSED and REMANDED.