Michelle OLIVER, et al.,
Plaintiffs-Appellees,

Kalamazoo Education Association and Michigan Education Association (80–1682, 80–1683, 81–1277, 81–1741), Plaintiffs-Intervenors-Appellants,

v.

KALAMAZOO BOARD OF EDUCATION, et al., Defendants-Appellees,

and

Michigan State Board of Education, et al., (80–1717), Defendants-Appellants,

Kalamazoo Board of Education (81–1770), Defendant-Appellant.

Nos. 80–1682, 80–1683, 80–1717, 81–1277, 81–1741 and 81–1770.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 9, 1982.

Decided May 6, 1983.

Rehearing and Rehearing En Banc Denied July 27, 1983.

Thomas A. Baird (argued), Foster, Swift, Collins & Coey, P.C., Lansing, Mich., for Kalamazoo Educ. Ass'n and Michigan Educ. Ass'n, plaintiffs-intervenors-appellants.

Robert A. Derengoski, Sol. Gen., Frank J. Kelley, Atty. Gen., Louis J. Caruso, Sol. Gen., Gerald F. Young, Richard P. Gartner (argued), Asst. Attys. Gen., Lansing, Mich., for Michigan State Bd. of Educ., et al., defendants-appellants.

Arthur Staton, Jr. (argued), Ford, Kriekard, Staton, Allen & Decker, P.C., Kalamazoo, Mich., for Kalamazoo Bd. of Educ., defendant-appellant.

Thomas I. Atkins, Gen. Counsel, Michael H. Sussman, Asst. Gen. Counsel (argued), NAACP Special Contribution Fund, Brooklyn Heights, N.Y., for Michelle Oliver, et al., plaintiffs-appellees.

Bruce A. Miller, Miller, Cohen, Martens & Sugerman, P.C., Detroit, Mich., filed brief amicus curiae, for American Federation of Teachers.

Before KENNEDY, Circuit Judge, PECK and BROWN, Senior Circuit Judges.

BAILEY BROWN, Senior Circuit Judge.

The issues presented in this proceeding involve the scope of the district court's remedial powers in a school desegregation case once a constitutional violation has been determined. The primary issue is whether the court has the power, nine years after issuing an injunction desegregating the students, to impose a quota for the hiring of black teachers and, concomitantly, to override the contractual seniority rights and state statutory tenure rights of white teachers in order to prevent the layoff of a disproportionate number of black teachers.

I.

In 1971 the district court held that the students in the Kalamazoo school system were intentionally segregated on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment, and issued a preliminary injunction effectively desegregating the students. *Oliver v. Kalamazoo Board of Education,* 346 F.Supp. 766 (W.D.Mich.), *aff'd,* 448 F.2d 635 (6th Cir. 1971).[1] The Kalamazoo Board of Education (KBE) remains subject to the permanent

---

1. The district court made the injunction permanent in 1973. 368 F.Supp. 143 (W.D.Mich. 1973), *aff'd,* 508 F.2d 178 (6th Cir.1974), *cert.* denied, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

injunction imposed in 1973, and the parties have returned to the district court a number of times. A history of the proceedings in this prolonged case can be found at 640 F.2d 782 (6th Cir.1980). This history will be consulted only to the extent necessary to resolve the present controversy.

Before the commencement of this action in 1971, the KBE was aware of the problem of actual segregation in its schools and had begun to address it. On November 6, 1968, the KBE appointed a citizens committee to study and recommend guidelines for desegregating its schools. See 498 F.Supp. 732, 736 (W.D.Mich.1980) and 526 F.Supp. 131 (W.D.Mich.1981). The citizens committee recommendations were divided into three phases. Phase One, to be implemented between September 1969 and September 1970, involved the recruitment and hiring of black supervisors, administrators, teachers, and counselors in order eventually to obtain a staff in each of these areas which was 20% black. App. 686. It is unclear how the citizens committee arrived at the 20% figure, although 20% appears to have been the approximate percentage of black students in the school system at the time. See 368 F.Supp. at 180. Phase Two involved education of all concerned as to the necessity of desegregation. On September 15, 1969, the KBE generally adopted the citizens committee Phase One and Phase Two recommendations and specifically resolved, as to staffing, that "20% shall be used as a guideline." App. 679. Phase Three, the plan for actual desegregation of students was adopted by the KBE on May 7, 1971. App. 688.

A change in the composition of the KBE led to the shelving of the implementation of the Phase Three student desegregation plans on July 6, 1971. The National Association for the Advancement of Colored People (NAACP) and certain individuals then brought this action. The district court issued a preliminary injunction on August 25, 1971, immediately placing in effect the May 7, 1971, Phase Three desegregation plans. See 346 F.Supp. 766. Shortly thereafter the Kalamazoo school system experienced financial difficulties, and the KBE proposed to lay off 103 teachers and counselors, which would have decreased the black teaching staff from 8% to 4% of the total. On October 7, 1971, the district court modified its preliminary injunction to prevent any layoffs. See 346 F.Supp. at 782–87. The court's rationale was that halving the black teaching staff would have a detrimental effect on the impending desegregation of students. The modified preliminary injunction did not, however, require the hiring of additional black teachers.

At the preliminary injunction stage the plaintiffs sought no relief as to the hiring of more black teachers. At the permanent injunction stage, however, the plaintiffs' Second Amended Complaint sought additional recruitment and hiring of black teachers. App. 334–35. The district court's 1973 opinion and permanent injunction did not expressly address the hiring issue. Its opinion did observe that the KBE had adopted the Phase One plan which, it noted, was being implemented. See 368 F.Supp. at 192. The permanent relief granted at that time was the desegregation of students by the court's adoption of "the basic concept of the May 7, 1971 plan," id. at 205, which, in turn, had adopted the Phase Three recommendation of the citizens committee. The only further discussion of the percentage of black teachers was as evidence of a constitutional violation in the segregation of the students, and not as to discrimination in hiring or to the scope of the remedy. See id. at 180; 508 F.2d 178, 185 (6th Cir.1974).

Until the present proceeding, relief has not been granted with respect to hiring of additional black teachers. However, in 1975, on KBE's motion to tax costs, this court held that plaintiffs had improperly designated that part of the record involving the issue of "faculty desegregation." 519 F.2d 619, 621 (6th Cir.1975). The court reached this result because the district court had denied relief as to "faculty desegregation" and plaintiffs had not appealed.

## II.

In 1980, the Kalamazoo school system experienced a financial crisis caused by a number of conditions, including a significant cut in state aid. 498 F.Supp. at 739–40. Moreover, there had been a marked decrease in the number of students in the system. The KBE decided to lay off 128 teachers, 76 of whom were tenured and 52 of whom were probationary. *Id.* at 741. Of these, 21 of the tenured teachers and 14 of the probationary teachers were black. These numbers, in strict compliance with the seniority system agreed to in the collective bargaining contract with the teachers' union, would cause a disproportionate number of black teachers to be laid off. The percentage of black teachers in the school system would decrease from 11.1% to 8.9%. *Id.* at 742. Nevertheless, KBE made the layoffs in June 1980.

The KBE filed a motion on July 7, 1980, requesting the district court to set aside the layoff and recall provisions of the collective bargaining agreement to the extent necessary to maintain the pre-layoff percentage of black teachers. The NAACP joined the KBE's motion, although it claimed that all black tenured and black probationary teachers must be immediately recalled and be immune from layoff altogether until the teaching staff becomes 20% black. The Kalamazoo Education Association, (KEA), and the Michigan Education Association, both teachers' organizations which had intervened as plaintiffs shortly after the inception of this litigation, the State Board of Education (SBE) and the Superintendent of Public Instruction, both of whom had been joined as defendants, opposed the motion, contending that layoffs and recalls must be instituted according to the contract provisions and state tenure law. *See* 4 M.C.L.A. §§ 38.71–38.191 (1967 & Supp.1982).

The relief granted by the district court, on September 30, 1980, did not totally conform to the position of any of the parties, though it closely approximated that sought by the NAACP. Interpreting its prior orders as ultimately requiring a teaching staff 20% black, the district court nullified the seniority rights of white teachers by ordering the KBE to: (1) recall all black tenured teachers currently laid off; (2) make all other recalls on the basis of seniority, except that at least 20% of such recalls in any one year must be black teachers, even if it required recalling some black probationary teachers ahead of white tenured teachers; and (3) fill future positions at an 80%-white, 20%-black ratio, even if it required the hiring of new black teachers ahead of the recall of some laid off white teachers. On November 4, 1981, the district court further enjoined the layoff of any black tenured teachers until the KBE attains a 20% black teaching staff. KEA and SBE appealed, contending that such orders must be vacated. KBE also appealed, but differs with KEA and SBE in that it contends the district court could and should have issued an order overriding the seniority requirements to the extent necessary to maintain the existing proportion of black teachers.

## III.

A threshold issue in this case is whether the district court had the power to address the merits of the relief requested by the KBE and the NAACP. The KEA and the SBE contend that, under res judicata principles, the district court was barred from reconsidering teacher issues and therefore did not have the power to nullify the seniority rights of white teachers. They reason that since the district court's 1973 decision denied any relief concerning staffing, the staffing issue cannot be reconsidered. KEA and SBE also add that since this court, in taxing certain costs to plaintiffs, construed the district court's order as denying this relief, the doctrine of law of the case reinforces the application of res judicata.

The district court, on the other hand, interpreted its prior orders as *requiring* a teaching staff 20% black, and it held that res judicata actually prevented it from requiring other than a 20% black teaching staff. 498 F.Supp. at 746. The court stated, however, that even if not barred from

reconsideration, it would hold that a teaching staff 20% black was required at this time to remedy the constitutional violations with respect to the students. *Id.* Thus it held alternatively that, regardless of res judicata principles, a 20% black teaching staff is now constitutionally required. *Id.* at 747–48.

A careful reading of the prior orders in this case casts serious doubt on the district court's conclusion that it previously required the KBE to achieve a teaching staff that is 20% black. To the extent that the teaching staff issue was addressed at all, the district court's overwhelming consideration was the assignment of existing black teachers to identifiably black schools as evidence of unlawful segregation. *See* 368 F.Supp. at 176–78, 202. The paucity of black teachers in the school system as a whole was noted, but only as evidence of a constitutional violation as to students. *Id.* at 180. Nothing in the district court's orders or opinions intimates a 20% quota as part of the remedy of that violation.

■ This conclusion is supported by the context of the district court's 1973 permanent injunction. As previously recounted, the KBE had, even before the action was commenced in 1971, voluntarily adopted Phase One of the citizens committee's recommendations, which included a program of recruitment and hiring of black teachers with 20% as a "guideline." The district court considered that Phase One was already being implemented. Since the KBE had already adopted, as a guideline, a teaching staff 20% black, it appears that the district court considered additional staffing relief unnecessary. Thus, the district court's reliance on res judicata principles is unfounded.

■ However, it does not necessarily follow that the district court's original failure to order this particular remedy precludes it from consideration at the present time, as the KEA and SBE contend. The KBE remains subject to the 1973 permanent injunction, and the district court has the continuing power to enter appropriate orders to remedy the constitutional violations until

such violations have been completely remedied. *See Oliver v. Kalamazoo Board of Education,* 640 F.2d 782, 789–90 (6th Cir. 1980). The fact that the district court denied a particular remedy in 1973 does not, by application of res judicata principles, preclude it from subsequently ordering that same remedy. At most, principles of res judicata would establish only that plaintiffs were not entitled to this remedy as of 1973.

### IV.

The district court held that, even if res judicata principles do not apply, a teaching staff 20% black is now required to remedy the previously determined constitutional violations in the Kalamazoo school system. This was the first time the court so held. The district court further held that, to make sufficient progress towards achieving this requirement, the seniority rights of white teachers could and should be overridden. The fundamental issue raised by the ruling is the proper scope of the district court's remedial powers in a school desegregation case. However, the district court's ruling has two distinct aspects, both of which need to be considered.

### A.

■ Generally, the remedy in school desegregation cases is to be determined according to traditional equitable principles. *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*). It requires a balancing of the individual and collective interests. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–1276, 28 L.Ed.2d 554 (1971). While the district court's discretion is broad, *id.* at 15, 91 S.Ct. at 1275, this does not mean there are no limits, *id.* at 28, 91 S.Ct. at 1282; the remedy must be designed "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." *Milliken v. Bradley,* 418 U.S. 717, 746, 94 S.Ct. 3112, 3128, 41 L.Ed.2d 1069 (1974) (*Milliken I*). Clearly, the remedy may extend to the composition and assignment of the teaching staff. *Swann;*

*United States v. Montgomery County Board of Education,* 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969).

### B.

The first aspect of the court's remedy is the institution of a quota system, requiring both a hiring quota of 20% black and an ultimate overall teaching staff of 20% black. Other courts have imposed teacher quotas as a remedy in school desegregation cases, *see, e.g., Morgan v. Kerrigan,* 388 F.Supp. 581 (D.Mass.1975), *aff'd,* 530 F.2d 401 (1st Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 386 (1976).

However, this remedy in a school desegregation case is not without conceptual difficulties. In most school desegregation cases, as in this one, *see* 498 F.Supp. at 746, 751, the constitutional rights to be vindicated are those of the students, not of the teachers or potential teachers.[2] The students, however, do not have a constitutional right to attend a school with a teaching staff of any particular racial composition. *See Fort Bend Independent School District v. City of Stafford,* 651 F.2d 1133 (5th Cir. 1981) (holding that the percentage of minority faculty need not approximate the percentage of minority students). Rather, with respect to the teaching staff, all that the students are entitled to is the "sustained good faith effort to recruit minority faculty members so as to remedy the effects of any past discriminatory practices." *Id.* at 1140.

There are also practical problems in imposing any racial quota for the teaching staff. Indeed, the experience of the Kalamazoo school system since 1969 is a prime illustration. Between the period 1970–71 and March 1979, 23.6% of the new teacher hires have been black. 498 F.Supp. at 738 & n. 3. This hiring rate has actually exceeded that now imposed by the district

court.[3] The school system has been able to increase its overall black teacher ratio during this same period from 6.5% to 11.5%. *Id.* at 739. Although this percentage exceeds most market indicators, *id.* at 745, the KBE has been unable to attain its own goal of 20%, apparently because a disproportionate number of black teachers leave for more lucrative opportunities in the private sector, *id.* at 738 & n. 4, and because 23.8% of the promotions to administrative positions in the school system between 1970–71 and January 1979 were black. App. p. 477. Indeed, in 1971 even the district court concluded that, after an extensive recruiting campaign, the KBE's "diligent efforts were only able to generate a staff roughly 8% black." 346 F.Supp. at 785. In imposing the 20% quota, the district court ignored this recent experience, even though practical considerations should inform the court's remedial order. *See Teamsters v. United States,* 431 U.S. 324, 375, 97 S.Ct. 1843, 1874, 52 L.Ed.2d 396 (1977) (the court should take practicalities into account in devising remedies under Title VII and in any equitable decree).

Moreover, there is little basis in the record for the 20% figure. The district court concluded, based on Dr. Green's testimony, that 20% represented the "critical mass" of black role models required for black students in the Kalamazoo school system, 498 F.Supp. at 747–48; but Dr. Green adopted the 20% figure because, according to the district court, "he said he would trust the [school] District's judgment in setting 20% as the critical mass." *Id.* at 748. The school district's 20% guideline, adopted in 1969, however, appears to have little to do with "critical mass." As well as we can determine, the 20% figure was adopted because it approximated the black student percentage at that time. In fact, the Green-Cohen re-

---

2. The district court has never actually held a hearing and determined that KBE discriminated against blacks in teacher hiring prior to the adoption of Phase One in 1969, and it is not contended that there has been any such discrimination since then.

3. If all the black teachers hired since 1970 had remained in this school system, black representation on the teaching staff would be 30%. App. at 954.

port[4] adopts the 20% figure simply as a goal of the school district itself. App. pp. 447–51. As a result, the 20% figure. is arbitrary.

■ We conclude that the district court erred in imposing any quota system for the Kalamazoo teaching staff in 1980. Over a ten-year period, 23.6% of Kalamazoo's new teacher hires have been black. The record indicates "the type of sustained good faith effort to recruit minority faculty members so as to remedy the effects of any past discriminatory practices." *Fort Bend Independent School District,* 651 F.2d at 1140. This is all the remedy to which the Kalamazoo students were entitled.

■ We do not hold that racial hiring quotas for the teaching staff are *per se* improper to remedy a violation of the students' constitutional rights even where there has been no discrimination in the hiring of teachers. The violation may be sufficiently egregious to warrant a temporary teacher hiring quota at the time of the determination of the constitutional violation *vis-a-vis* the students. But, generally, the wiser approach is a more flexible affirmative action program rather than a hiring quota. *Cf. University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (affirmative action admission programs of educational institutions may take race into account, but racial quotas are prohibited).

### C.

The rejection of the quota system does not, however, conclude the matter. The district court also nullified the contractual seniority rights and the state statutory tenure rights of white teachers. The layoff and recall schedule imposed by the district court might be necessary to remedy the constitutional violation independent of the quota system. As a result, the nullification of the seniority and tenure rights must be evaluated irrespective of the validity or invalidity of the quota system.

The advantages of seniority based on length of service are well established and need not be recounted here. *See* Summers and Love, *Work Sharing as an Alternative to Layoffs by Seniority: Title VII Remedies in Recession,* 124 U. of Pa.L.Rev. 893, 899–906 (1976). Suffice it to say that seniority is pervasive in the labor field;[5] the Supreme Court has recently reiterated the "overriding importance" of seniority provisions, *American Tobacco Co. v. Patterson,* 456 U.S. 63, ——, 102 S.Ct. 1534, 1541, 71 L.Ed.2d 748, 760 (1982); and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17, expressly permits "bona fide seniority systems." These seniority rights have engendered strong expectations and acceptance within the labor field. *See* Summers and Love, *supra.*

■ Of course, the district court has the power to order those remedies required to vindicate the students' constitutional rights. The district court, applying a standard of "reasonableness," concluded that nullification of seniority rights was appropriate. 498 F.Supp. at 752. However, to protect the strong expectations in these pervasive and important seniority rights, the remedy must be "necessary," not merely "reasonable," to vindicate the constitutional rights of the students.[6] This court has previously

---

**4.** This report was prepared by Dr. Green and others upon direction of the district court and was the subject of the litigation dealt with at 640 F.2d 782.

**5.** A survey by the Bureau of National Affairs in 1979 found seniority provisions in almost 90% of the 400 collective bargaining contracts surveyed. BNA, *Basic Patterns in Union Contracts,* at 73 (9th ed. 1979).

**6.** The district court adopted the "reasonableness" standard of *Detroit Police Officers' Association v. Young,* 608 F.2d 671 (6th Cir.1979),

cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981). But that case involved approval of a voluntary affirmative action program for promotion. The present case involves the imposition of a strict 20% quota where KBE had only adopted a "guideline" and involves the nullification of the expectation in contractual seniority rights, not merely the loss of some opportunity for promotion. Indeed, the *Detroit Police Officers' Association* court expressly observed that "[t]his is not a case in which white employees were deprived of vest-

held in this case that the court-imposed remedy must be "necessary" and "tailored" to cure the constitutional violations. *Oliver v. Kalamazoo Board of Education,* 640 F.2d 782, 789–90 (6th Cir.1980). Discussing seniority rights in particular, this court has stated that there must be a determination that "it was *necessary,* to vindicate plaintiffs' constitutional rights, to hold such contract and statutory rights of the Union to be unenforceable." *Brown v. Neeb,* 644 F.2d 551, 566 (6th Cir.1981) (emphasis added).[7]

■ The record does not demonstrate that nullification of the seniority and tenure rights of white teachers is necessary to vindicate the students' constitutional rights. Indeed, the record is silent as to the actual effect of the layoffs on the students. The district court refers to a "critical mass" of black role models necessary for black students, but even assuming that that theory should be adopted, the record simply does not reveal the actual "critical mass" percentage for the Kalamazoo school system. Moreover, if a more conventional standard were used, that of labor market statistics, the percentage of black teachers after the seniority-based layoffs, 8.9%, is comparable to a number of relevant labor market indicators. *See* 498 F.Supp. at 745.[8] Indeed, in this case, the record fails to justify the relief granted by the district court even under the "reasonableness" standard applied by the district court.

The present situation can be contrasted to the proposed layoffs in 1971. After the issuance of the preliminary injunction, the KBE proposed the layoff of 103 teachers and counselors, which would have decreased the black teacher ratio from 8% to 4%. The district court, concerned about the detrimental effect on the impending desegregation plans, enjoined the layoffs. But the evidence indicated that the layoffs would "tear out the heart of the desegregation plan," 346 F.Supp. at 785, and it was a reasonable inference that the KBE's decision to make the layoffs was "in effect, [to] sabotage the integration effort." *Id.* at 786. Indeed, even there the district court did not nullify seniority rights, but rather enjoined the layoffs altogether. The situation in 1971 was much more compelling than the present one.

*Brown v. Neeb* supports this conclusion. That case involved minority employment in the Toledo fire department. The majority opinion affirmed the district court's preliminary injunction enjoining any layoffs which would have reduced the proportion of minority firefighters. But this remedy was firmly based on the lack of progress in increasing the proportion of minority firefighters, id. at 565, see Table, *id.,* at 555–56, while the KBE has significantly increased the proportion of black teachers. Moreover, this court in *Neeb* emphasized that the holding of the district court did not override the contractual or statutory rights of white firefighters. *Id.* at 565–66. In contrast, the district court below directly overrode the seniority rights of white teachers.

In summary, the district court's nullification of the seniority and tenure rights of white teachers was improper. The court applied a "reasonableness" standard, but nullification of seniority rights must be "necessary" to vindicate the constitutional

ed employment rights." *Id.* at 696 n. 12. The "reasonableness" standard is insufficient to protect the teachers' expectations in seniority rights, and the "necessary" standard of *Brown v. Neeb,* 644 F.2d 551 (6th Cir.1981), discussed *infra,* is more appropriate.

7. For an explanation of the incorrect publication of the opinions in *Neeb,* see *Alternatives to Seniority-Based Layoffs: Reconciling Teamsters,* Weber, *and the Goal of Equal Employment Opportunity,* 15 U.Mich.J.L.Ref. 523, 536 n. 76 (1982).

8. The conclusion that the nullification of seniority and tenure rights in this case is improper is not inconsistent with *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The Supreme Court held that retroactive seniority rights could be awarded as an element of the remedy of a Title VII violation. But retroactive seniority rights will usually be necessary to remedy a Title VII violation. We simply conclude in this case that the plaintiffs have failed to demonstrate the necessity of the nullification of the seniority and tenure rights to remedy the violations of the students' constitutional rights.

rights. The plaintiffs simply failed to demonstrate the necessity of the proposed remedy, or in fact that the proposed remedy would have any effect at all on the constitutional rights of the students.[9]

## V.

The district court was not barred from considering the merits of the KBE's motion. However, the district court erred in imposing a quota system for the hiring and composition of the teaching staff of the Kalamazoo school system. Nullification of the seniority and tenure rights of white teachers was also error. The district court's orders are vacated and the case is remanded for dismissal of KBE's motion to override the seniority provisions in the collective bargaining contract and the Michigan tenure statute.[10]

---

**9.** It should be noted that, under Article XXII, Sections A and E of the collective bargaining contract, with respect to probationary teachers, race may be considered in layoffs and recalls to promote racial balance on the teaching staff. The right of the KBE to effect layoffs and recalls pursuant to such provision is not challenged.

**10.** The SBE argues (brief at p. 3) that the parties (*i.e.,* the NAACP and KBE) "continue to seek District Court intervention in financial, educational and labor matters that are not properly part of this school desegregation case" and that "unless this Court acts decisively, there will be no end to these requests for federal judicial intervention in the Kalamazoo school system." In this connection, we note that Judge Weick, concurring in part and dissenting in part in this court's last reported opinion in this case (640 F.2d at 820), would have not only vacated the district court's orders (as this court did) but would have also remanded with instructions to dismiss the case.

One difficulty with accepting SBE's invitation to remand with instruction to dismiss is that KBE, the original defendant, apparently does, not desire that the case be dismissed. *See, e.g.,* the comments in the opinion of this court in 640 F.2d at 810. Further, as has been stated herein, after KBE had actually effected some teacher layoffs in 1980 in accordance with the seniority provision in the collective bargaining contract and Michigan tenure law, instead of awaiting action, if any, by the NAACP, KBE initiated this round of litigation to obtain an order from the district court overriding seniority requirements to allow it to maintain parity between black and white teachers. The district court, of course, at the request of the NAACP, decreed a package of relief that KBE did not and does not want. But, as stated, this round of litigation was instituted by KBE, the body with the responsibility of operating this school system.