# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-60722

United States Court of Appeals
Fifth Circuit

**FILED**

February 6, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

>   Plaintiff

v.

CYNTHIA FLETCHER, A minor, by Rev. Artis Fletcher, as next friend, and Gloria Jean Barnes and David Barnes, minors, by Rev. Theotis Smith, as next friend, suing in their own behalf and on behalf of all others similarly situated,

>   Intervenor Plaintiff - Appellant

v.

STATE OF MISSISSIPPI,

>   Defendant

SIMPSON COUNTY SCHOOL DISTRICT,

>   Intervenor Defendant - Appellee

Appeals from the United States District Court
for the Southern District of Mississippi

Before WIENER, ELROD, and SOUTHWICK, Circuit Judges.

WIENER, Circuit Judge:

No. 16-60722

Since 1970, the Simpson County School District ("the District") has been under a consent decree to monitor the District's efforts to desegregate its school system. Students attending District schools ("the Intervenors") intervened in the litigation in 1982, contending that the District had not properly complied with the consent decree. In 2015, the District moved for a finding of unitary status in the area of faculty and staff employment. The Intervenors objected, and after a hearing, the district court granted unitary status. The Intervenors now appeal, and we affirm.

## I. FACTS AND PROCEEDINGS

In July 1970, the United States sued the State of Mississippi and several of its school districts, including the District, alleging that they operated school systems that were segregated by race. In August 1970, the district court enjoined the District from discriminating based on race, and outlined various procedures designed to end segregation in the District. The 1970 order addressed specific areas: faculty and staff assignments, student transfers, transportation, school construction and site selection, and extracurricular activities.

In 1982, the Intervenors filed a class action complaint against the District for failing to comply with the 1970 order. In 1983, the district court entered another decree, outlining further procedures for the District. These included procedures aimed at employment practices, *viz.*, requiring the District to advertise available positions, use standard forms and objective rating criteria to review and score applications, and offer positions to the highest-scoring applicant regardless of race. The 1983 decree also required that the District notify the United States and Intervenors of any proposed

2

No. 16-60722

change to employment procedures.[1] In 2001, the District moved for unitary status. The Intervenors did not respond, and the United States objected only in the area of faculty and staff assignments. The district court denied unitary status in that area, but granted unitary status in all other areas.[2]

In 2011, the court entered another consent decree expanding on the required employment procedures. Specifically, the 2011 decree required that (1) the District advertise vacant positions for at least three weeks and post them in specified locations, (2) the District maintain efforts to increase the number of qualified African-American applicants, (3) the District's HR Director score applicants using objective criteria and a standard scoring form, (4) the principal or superintendent interview the highest-scoring applicants,[3] (5) the interviewers complete an interview form (attached to the decree) with numerical scores for various criteria, and (6) the District offer the position to the candidate with the highest combined pre- and post-interview scores.

The decree generally required the District to interview candidates with high initial scores. If the District declined to interview an applicant with a higher score than another applicant selected for an interview, the principal or Superintendent had to state in writing why he or she did not interview such applicant. The only reasons permitted by the decree for declining to interview such an applicant were: (1) the applicant declined the interview, (2) the District could not contact the applicant after a prescribed number of attempts, (3) based on information disclosed in a prior interview, reference check, background, or misrepresentation on an application, the applicant "was deemed unsuitable for

---

[1] The decree also included reporting requirements regarding the racial composition of applicants, new hires, and employees who were demoted or fired.

[2] That decision was affirmed on appeal.

[3] Specifically, the District must interview at least the highest-scoring applicant; if it interviews a lower-scoring applicant, it must also interview all other applicants who score higher.

employment[,]" or (4) "the applicant was terminated or non-renewed for good cause from any previous employment position."

The District could decline to offer the position to the highest-scoring applicant only "if a legitimate negative reason exists not to hire the applicant." The consent decree gave examples of such negative reasons: (1) negative comments from references, (2) false information on an application, (3) failure to satisfy background check requirements, or (4) termination or non-renewal from a previous position. The decree further specified that "[t]he District may not, however, fail to hire the highest overall-rated applicant only because it favors a lower-rated applicant." If the District wanted to hire a lower-scoring applicant, it had to notify the United States and the Intervenors, who had the opportunity to object.[4]

In 2012, the district court granted the United States' motion to enjoin the District from violating the 2011 decree, on the grounds that the District had hired several non-highest-scoring applicants without proper notice to the United States. In 2013, the District moved for unitary status with respect to faculty and staff assignments. The United States did not object, but the Intervenors did, and the district court held a two-day hearing. The court received over five hundred objections from the community, but many of these were generic and did not state details. At the hearing, some objectors who had been denied employment or promotion by the District testified. In April 2014, the district court denied unitary status, citing use of modified interview guides and ranking forms without notice of the proposed change as an example of the District's non-compliance. The district court also extended the 2011 decree to

---

[4] The United States and Intervenors could also object to hiring an applicant who did not have the highest initial, pre-interview score.

No. 16-60722

March 15, 2015. The Intervenors appealed that decision, challenging some of the court's factual findings. That appeal was dismissed for lack of standing.[5]

In September 2015, the District yet again moved for unitary status. This time there were approximately sixty-five objections, many of which were merely generic.[6] The district court held another two-day hearing in 2016, and granted the motion for unitary status, after considering the testimony from both the 2014 and the 2016 hearings. The Intervenors now appeal.

## II. STANDARD OF REVIEW

This court reviews a finding that a school district is unitary for clear error.[7] Under that standard, we will reverse only if we have a "definite and firm conviction that a mistake has been committed."[8] But a court reviewing for clear error may not reverse the district's court finding if it is plausible in light of the entire record.[9] If the finding is plausible in light of the record, we may not reverse even if, "had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently."[10] Neither will we "discount 'the district court's reasonable factual inferences from the evidence.'"[11]

"The burden of showing that the findings of a district court are clearly erroneous is heavier if credibility of witnesses is a factor in the district court's determination."[12] "When findings are based on determinations regarding the

---

[5] *United States v. Fletcher ex rel. Fletcher*, 805 F.3d 596 (5th Cir. 2015).

[6] The United States did not object, however.

[7] *Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292, 296 (5th Cir. 2008).

[8] *Yates v. Collier*, 868 F.3d 354, 363 (5th Cir. 2017) (quoting *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1118 (5th Cir. 1991)).

[9] *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017).

[10] *Yates*, 868 F.3d at 363 (alterations in original) (quoting *In re Omega Protein, Inc.*, 548 F.3d 361, 367 (5th Cir. 2008)).

[11] *Imperial ED Promotions, L.L.C. v. Pacquiao*, 549 F. App'x 295, 299 (5th Cir. 2013) (per curiam) (quoting *Glass v. Petro–Tex Chem. Corp.*, 757 F.2d 1554, 1559 (5th Cir. 1985)).

[12] *Theriot v. Par. of Jefferson*, 185 F.3d 477, 490 (5th Cir. 1999) (citation omitted); *see also City of El Paso v. El Paso Entm't, Inc.*, 464 F. App'x 366, 372 (5th Cir. 2012) (per curiam) ("[W]here the court's finding is based on its decision to credit the testimony of one witness

No. 16-60722

credibility of witnesses, [Federal Rule of Civil Procedure] 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."[13]

## III. DISCUSSION

"The ultimate inquiry in determining whether a school district is unitary is whether (1) the school district has complied in good faith with desegregation orders for a reasonable amount of time, and (2) the school district has eliminated the vestiges of prior *de jure* segregation to the extent practicable."[14] This standard also applies when assessing whether a school district is unitary in employment practices.[15]

The Intervenors focus on individual employment decisions—that is, the District's decisions to interview, hire, promote, or fire specified persons—whose treatment they contend shows violations of the consent decree and remnants of de jure segregation. The district court held that none of these

---

over that of another, that finding, if not internally inconsistent, can virtually never be clear error." (quoting *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993))).

[13] *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (citing *Wainwright v. Witt*, 469 U.S. 412 (1985)).

[14] *Anderson*, 517 F.3d at 297 (footnote omitted) (citing *Hull v. Quitman Cty. Bd. of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993) and *Freeman v. Pitts*, 503 U.S. 467, 492, 498 (1992)); *see also Freeman*, 503 U.S. at 491 ("Among the factors which must inform the sound discretion of the court . . . are the following: whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.").

[15] *Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1140 (5th Cir. Unit A July 1981) ("The proper inquiry to be undertaken in an effort to determine whether the FBISD is now unitary is two-fold: first, the district's current employment practices must be non-discriminatory and in compliance with constitutional standards; second, the adverse effects of any earlier, unlawful employment practices must have been adequately remedied.").

individual employment decisions showed that the District failed to comply with the consent decree or that the District acted in bad faith. The court also held that the employment decisions did not demonstrate remnants of de jure segregation.

## A. The District's Good Faith Compliance With The Consent Decree

This court views the district court's finding that a school district has complied with a desegregation order in good faith in light of the entire record.[16] In evaluating unitary status, "a court should give particular attention to the school system's record of compliance."[17] The record of good faith compliance must be "consistent[]."[18]

The Intervenors presented hundreds of pages of evidence relating to more than twenty employment-related decisions in the District over the past several years. The district court heard four days of testimony, at two different fairness hearings, from District officials and individuals who had applied for employment or promotion in the District. The Intervenors urge that various employment decisions show that the District failed to strictly follow the consent decree in good faith; District officials provided explanations for the alleged defections from consent decree procedures.

We need not recount each of the Intervenors' allegations here. The district court's finding that the District did not act in bad faith was based significantly on its assessment of the credibility of the District officials' testimony explaining the employment decisions at issue. In each instance, the district court credited this testimony of District officials over the evidence that

---

[16] *Anderson*, 517 F.3d at 298.

[17] *Freeman*, 503 U.S. at 491.

[18] *Anderson*, 517 F.3d at 297 (quoting *Hull*, 1 F.3d at 1454).

the Intervenors suggested showed bad faith.[19] We are not in a position to reassess the district court's decisions to find some evidence credible and weigh it more heavily than other evidence. Only the district court is able to observe the witnesses and "the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."[20] "[T]his court does not reweigh evidence and must defer to the trial court's assessment of the credibility of witnesses."[21] The fact that contradictory evidence might exist does not compel us to overturn the district court's decision to credit other evidence instead.[22] The Intervenors have not shown "the very rarest of circumstances"[23] that would allow us to revisit the district court's weighing the credibility of the evidence.[24]

Even when the parties seem to agree on the facts, the Intervenors' remaining arguments do not demonstrate clear error. The Intervenors generally complain that the District violated the spirit of the consent decree— or, as counsel put it at oral argument, "manipulated" the consent decree— demonstrating the District's bad faith. But assessing the District's motivations for particular acts again required the district court to make factual determinations. We may only overturn these factual determinations if they are implausible in light of the entire record. We here conclude that they are not.

---

[19] The district court similarly credited the District's documentary evidence, such as the candidate summaries that it created in reviewing each candidate's scores, interview comments, and information gleaned from references.

[20] *Anderson*, 470 U.S. at 575 (citing *Wainwright*, 469 U.S. 412 (1985)).

[21] *Perez v. Bruister*, 823 F.3d 250, 269 (5th Cir. 2016).

[22] *See id.*

[23] *Shami v. Comm'r*, 741 F.3d 560, 565 (5th Cir. 2014) (quoting *Durrett v. Comm'r*, 71 F.3d 515, 517 (5th Cir. 1996)).

[24] For example, the district court resolved a factual dispute about whether Misty Hannah interviewed her husband, Charles Hannah. The district court concluded that Misty was "in attendance for the sole purpose of taking notes for the interviewers." This conclusion is consistent with testimony from district officials, and is plausible in light of the record. For this reason, we will not disturb the district court's conclusion that this is not an example of the District's bad faith.

No. 16-60722

For example, the Intervenors cite a number of instances when the District did not hire the highest-rated applicant. In those instances, the District proffered a reason for failing to do so, which it contends is a "legitimate negative reason" according to the consent decree. The Intervenors counter that these proffered reasons are pretextual. But there is evidence supporting the conclusion that the District's actions were consistent with the consent decree. That indicates that the District's motivations were genuine and not pretext.[25] These motivations are therefore plausible in light of the record.

Similarly, the Intervenors complain that the District took a number of actions that were not permitted by the consent decree, such as when the District (1) relied on information about candidates that it received from outside of the formal interview process and (2) allowed individuals who recommended applicants to later interview those applicants. Such practices are not explicitly permitted by the consent decree, but neither are they prohibited by it. The district court therefore had to determine whether the District's practices demonstrated bad faith. It concluded that they did not, and there is insufficient information in the record to upset that conclusion. For example, to prohibit

---

[25] At oral argument, the Intervenors' counsel cited as an example the District's failure to hire Katrina Smith. She had applied to be an instructional assistant, but she testified that she told the District that she wanted the position because she had not passed the teacher-licensing test. Smith had previously been a teacher in another school district, but had to stop when her license expired and she did not pass the test to renew it. Smith was the highest-scoring applicant, but in recommending a different candidate, the HR Director wrote "[Smith] has a teaching position waiting for her[.]" This suggests that the District suspected that she would return to her old teaching job once she passed the test. Smith testified that this was not accurate, but also that she wanted the Simpson County job "because [she] did not pass" the licensing test to continue in her prior job. The district court reasonably concluded that the District relied on its suspicion—surely if Smith did intend to return to her old job, the District would not expect her to say so explicitly. There is not sufficient information in the record to overturn the district court's implicit determination that the District's expectation that Smith would leave the position if her old job as a teacher became available was a legitimate reason not to hire her. Even if it were not, it is equally plausible from the record that the District was confused about Smith's intentions, rather than that it was acting in bad faith.

employees who recommend an applicant from interviewing that applicant would be infeasible. It is likely that many employees of a small school district would know each other. In fact, there was testimony that in at least one case, references who interviewed a candidate were "part of the leadership team" for the position being interviewed for. The Intervenors complain that an interviewer who has given a favorable recommendation or reference taints the "objective" nature of the hiring process under the decree. But interviewing is inherently a subjective process. The consent decree does not purport to remove all subjectivity; it attempts to give quantitative values to what are still subjective criteria.

In sum, the Intervenors have pointed to no practice or incident that was objectively a violation of the consent decree. Instead, they have claimed to show examples of the District's bad faith. Perhaps some of these examples could be interpreted to show bad faith on the District's part, but the evidence in the record does not compel that conclusion. The evidence before the district court—including contemporaneous records made regarding each hiring decision—supports the District's explanations for all of its decisions. To assess whether the District acted in bad faith, the district court was required to make factual determinations from the evidence, and the whole of the record shows that these factual determinations were plausible. We therefore have no basis to find clear error in these conclusions.

## B. Eliminating Vestiges Of De Jure Segregation

The district court held that the District has eliminated the vestiges of de jure discrimination in employment, pointing to the strides that the District has made since the inception of the consent decree: The number of African-American teachers has increased or remained steady in the last decade, and the District has endeavored to recruit at historically black colleges and universities. The Intervenors do not challenge these factual findings. Instead,

they contend that de jure segregation remains because the District continues to engage in "racially motivated" employment decisions, and "cronyistic" and "nepotistic" hiring—that is, considering only the favored candidates of those in authority in the District.

Eliminating the vestiges of de jure segregation requires "ensur[ing] that the principal wrong of the *de jure* [segregation] system, the injuries and stigma inflicted upon the race disfavored by the violation, is no longer present."[26] But "a formerly segregated school system need not employ a faculty having a racial composition substantially equivalent to that of its student body [to effectively] desegregate its schools and attain unitary status."[27]

As for the alleged racially motivated employment decisions, the Intervenors complain that a number of hiring decisions were racially discriminatory.[28] If the District did engage in discriminatory hiring, that would require reversal. But as explained above, the district court found that the various employment decisions did not violate the consent decree: Because all of those decisions were found to have been made in good faith, the court also found that none were "motivated by race." In other words, the district court concluded that the District's non-racial motivations for its actions were genuine. As explained above, these findings were not clear error. Because we do not reverse the district court's holding that these decisions were in good faith, did not conflict with the consent decree, and showed no pretext, we also

---

[26] *Freeman*, 503 U.S. at 485.

[27] *Fort Bend Indep. Sch. Dist.*, 651 F.2d at 1138.

[28] The District argues that many of the hiring officials who declined to hire African-Americans were themselves African-Americans, so that decision cannot be discriminatory. But as the Intervenors point out, what matters is whether the employee was treated differently because of race; the employer's race is irrelevant.

must affirm the conclusion that none show the racially discriminatory hiring[29] that would perpetuate de jure segregation.

As for the alleged cronyism, the Intervenors cite to no case in which a court has addressed—much less held—that cronyism perpetuates the vestiges of de jure segregation. We may assume that if cronyism existed, it could entrench the vestiges of segregation.[30]  It is true that many candidates who were hired had some connection to those who made hiring decisions, but this is not surprising: The District is relatively small, and officials will obviously know some candidates better than others. But again, the district court's determination that none of the hiring decisions involved improper decision-making was plausible in light of the record. This compels the conclusion that none of the hires were made because of cronyism. In other words, the district court found that the District's hiring decisions all involved legitimate motives, and not cronyism.[31] Because these were factual determinations that are plausible in light of the record, we will not disturb them on appeal.

## IV. CONCLUSION

As the district court noted in granting unitary status, its order is the final decision in a process that began over forty years ago. In fact, this appeal concerns only employment, which was ultimately only one aspect of the racial segregation that once existed within the Simpson County School District. The district has been unitary in every other area—including in its most vital area,

---

[29] Even if an individual example cited by the Intervenors was suspicious, many of the decisions the Intervenors claim are discriminatory involve the District recommending a lower-ranking candidate of the same race as a higher-ranking candidate, and cannot be evidence of de jure racial discrimination.

[30] *Cf. Freeman*, 503 U.S. at 489 ("A remedy is justifiable only insofar as it advances the ultimate objective of alleviating the initial constitutional violation.").

[31] Cronyism, by definition, requires favoring particular candidates "without regard to their qualifications." *Cronyism*, AM. HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011). It follows that if the District legitimately considers all candidates' qualifications, there is no cronyism.

educating students—for more than ten years. As the district court noted, there is an entire agency devoted specifically to the kinds of employment disputes that are at issue in this appeal.

Finally, in the words of the Eleventh Circuit:

> This judgment means that appellants have accomplished what they, decades ago, set out to do. They challenged a rigidly maintained, *de jure* system of school segregation and sued to bring it into compliance with the constitutional requirement of equal protection under the law. We say today that they have succeeded. If this judgment is counted as a loss for appellants, it is so because they have won.

> . . . The Board, and the people . . . who, in the end, govern their school system, must be aware that the door through which they leave the courthouse is not locked behind them. They will undoubtedly find that this is so if they fail to maintain the unitary system we conclude exists today.[32]

The judgment of the district court is AFFIRMED.

---

[32] *NAACP, Jacksonville Branch v. Duval Cty. Sch.*, 273 F.3d 960, 976–77 (11th Cir. 2001).