IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 11, 2008

Charles R. Fulbruge III
Clerk

No. 06-60902

JOAN ANDERSON

Plaintiff-Appellant

V.

SCHOOL BOARD OF MADISON COUNTY

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before JONES, Chief Judge, and DeMOSS and STEWART, Circuit Judges.

DeMOSS, Circuit Judge:

Since 1969, the Madison County School District ("MCSD") in Mississippi has been under a federal court order to desegregate its schools. On June 18, 2004, the MCSD filed a motion for full unitary status, claiming it had complied with the district court's orders and had "to the extent practicable, eliminated the vestiges of racial discrimination resulting from the former racially dual system."[1] The United States ("Government") and a group of private citizens ("Private Plaintiffs" or "Appellants") opposed the motion and argued that the MCSD was

---

[1] We use the term "unitary" in this context to refer to a school district that "has done all that it could to remedy the [prior] segregation caused by official action." Price v. Austin Indep. Sch. Dist., 945 F.2d 1307, 1314 (5th Cir. 1991).

not entitled to full unitary status. After discovery and a hearing, the district court granted the MCSD's motion on April 7, 2006, ending more than three decades of federal court supervision over the school district. Only the Private Plaintiffs have appealed.

I.

The MCSD is one of many school districts in Mississippi that at one time practiced de jure raced-based segregation. Pursuant to the Supreme Court's directive in Alexander v. Holmes County Board of Education, 396 U.S. 19, 20 (1969), we mandated that those school districts could "'no longer operate a dual school system based on race or color' and [that] each district is to operate . . . as a unitary school system within which no person is 'effectively excluded from any school because of race or color.'" United States v. Hinds County Sch. Bd., 423 F.2d 1264, 1267 (5th Cir. 1969) (quoting Alexander, 396 U.S. at 20). The district court for the Southern District of Mississippi, finding that the MCSD operated a de jure segregated school system, issued its original desegregation order in 1969, requiring the MCSD to (1) divide the school district into three attendance zones, (2) implement a transportation scheme that is "non-segregated and non-discriminatory," and (3) select locations for school construction and school consolidation "in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented."

Since the issuance of the 1969 order, the district court has supervised the MCSD's desegregation efforts and enforced compliance through a series of consent orders. The most recent consent order, approved by the district court on April 24, 2000, addressed a number of issues including school construction, transportation, majority-to-minority transfers, staff recruitment, hiring, assignment and compensation, and the creation of a bi-racial advisory committee.

On June 18, 2004, the MCSD filed a motion for declaration of full unitary status. Following discovery, the Government and Private Plaintiffs stipulated in a pretrial order that they did not object to a finding of unitary status with regard to eleven operational areas: (1) student assignment, except as it related to the magnet program at Velma Jackson High School ("VJHS"), (2) enforcement of student attendance zones and student transfers, (3) transportation, (4) extracurricular activities, (5) majority-to-minority transfers, (6) special education programs, (7) gifted programs, (8) student discipline, (9) the bi-racial advisory committee, (10) a Title I initiative program, and (11) the MCSD's reporting obligations.

However, both the Government and Private Plaintiffs objected to a finding of unitary status with respect to the magnet program and facilities at VJHS, and facilities at other schools. The Private Plaintiffs further objected to a finding of unitary status regarding (1) faculty assignment, (2) employment procedures, (3) the use of sixteenth section funds[2] and contributions from private groups, and (4) an alternative school. The Private Plaintiffs also argued that the motion should be denied because the MCSD did not act in good faith to comply with the court's orders to remedy problems in these areas.

In February 2006, the district court held a four-day public hearing on the MCSD's motion and both sides presented witness testimony. Members of the public were also invited to comment on the motion. On April 7, 2006, the district court issued a thorough and well-reasoned Memorandum Opinion and Order concluding that the MCSD was entitled to full unitary status. Based on that

---

[2] "Both the Northwest Ordinance and the Act of 1802 called for the territory to be divided into townships having thirty-six numbered sections and required that the sixteenth section of each township be used for the support of the public schools within each township." Madison County Bd. of Educ. v. Ill. Cent. R.R. Co.,728 F. Supp. 423, 425 (S.D. Miss. 1989).

conclusion, the court granted the MCSD's motion and dissolved all existing desegregation and consent orders. The Private Plaintiffs timely appealed.

A basic description of the MCSD's geography is helpful in understanding the present dispute over whether the district court erred in finding that the MCSD is entitled to full unitary status. The MCSD serves all of Madison County, except for an area served by the Canton Public School District. In 1969 the MCSD served approximately 4,500 students, 75% of whom were African-American. By contrast, in the fall of 2005, the MCSD served almost 11,000 students, approximately 38% of whom were African-American and 58% were white. Pursuant to the 1969 desegregation order, the MCSD is divided into three zones. Zone I, located in the northeast part of Madison County, covers a geographically large but rural and sparsely populated area. Student enrollment at Zone I schools is more than 96% African-American. Zone II accounts for 85% of the MCSD's total enrollment, and encompasses the cities of Ridgeland and Madison in the southern part of Madison County. Zone III covers a rural area and only serves about 5% of the MCSD's students.

II.

A. Standards of Review

The district court's finding that the MCSD is unitary is a factual finding that we review for clear error. See Flax v. Potts, 915 F.2d 155, 157 (5th Cir. 1990). "[A] finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (internal quotation marks omitted). However, if the district court's factual findings are "plausible in light of the record viewed in its entirety, we must accept them, even though we might have weighed the evidence differently if we had been sitting as a trier of fact." Price v. Austin Indep. Sch. Dist., 945 F.2d 1307, 1312 (5th Cir. 1991) (internal

quotation marks omitted). We have also recognized that, given the unique factual circumstances present in school desegregation cases, the district court's factual findings are entitled to "great deference." Flax, 915 F.2d at 158. This is particularly true when, as here, the district judge has "supervised the case for many years." Id. We review de novo whether an issue is ripe for judicial review. See Groome Res., Ltd. v. Parish of Jefferson, 234 F.3d 192, 198-99 (5th Cir. 2000).

### B. Ripeness

As an initial matter, Appellants argue that several issues decided by the district court were not ripe for review. In determining whether a matter is ripe for judicial review we consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Orix Credit Alliance, Inc. v. Wolfe, 212 F.3d 891, 895 (5th Cir. 2000) (internal quotation marks omitted); see United Transp. Union v. Foster, 205 F.3d 851, 857 (5th Cir. 2000) ("Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review."). Generally, issues are not ripe if "further factual development is required." Wolfe, 212 F.3d at 895.

First, Appellants point out that in 2005 the parties agreed to a create a committee to evaluate and recommend changes to the magnet program at VJHS. It is undisputed that the committee had not completed its evaluation by the time the district court granted the MCSD's motion. Appellants argue that the district court should have postponed its ruling until the committee completed its evaluation. Second, Appellants contend that the district court did not wait long enough following renovations and repairs at VJHS in 2005 to be able to adequately judge whether the magnet program could attain its goal of attracting white students. Lastly, Appellants argue that because of the MCSD's poor track record in honoring construction commitments, the court erred by ruling on the

MCSD's motion while construction projects remained pending throughout the district.

We find these arguments unavailing. The factual record in this case has been extensively developed over more than thirty years of district court supervision. Further, prior to ruling on the MCSD's motion, the court conducted a lengthy public hearing where both sides presented evidence. Appellants cite no authority, and we have found none, requiring district courts to consider motions for unitary status only upon the completion of all school district construction projects and committee evaluations. Given the unique nature of desegregation litigation, such a requirement would be impractical, and as the MCSD points out, would likely result in the MCSD remaining forever under federal court supervision. Also, the current magnet program at VJHS had been in full operation since the 2000-2001 school year, long enough to allow the district court to make informed findings concerning its effectiveness—nothwithstanding Appellants' argument that the 2005 renovations could possibly have some future effect that was not observable to the court in 2006. Thus, we find that no further factual development was required, and the issues decided by the district court were ripe for review.

## C. Motion for Unitary Status

The district court granted the MCSD's motion for declaration of unitary status. The ultimate inquiry in determining whether a school district is unitary is whether (1) the school district has complied in good faith with desegregation orders for a reasonable amount of time,[3] and (2) the school district has eliminated the vestiges of prior de jure segregation to the extent practicable. See

---

[3] This prong has alternately been stated as requiring good faith compliance with the desegregation decree "since it was entered." See Bd. of Educ. of Okla. City Pub. Sch. v. Dowell, 498 U.S. 237, 249-50 (1991). However, in Freeman v. Pitts, the Supreme Court cited to this language in Dowell and construed it as requiring "good-faith compliance . . . over a reasonable period of time." 503 U.S. 467, 498 (1992) (emphasis added).

Hull v. Quitman County Bd. of Educ., 1 F.3d 1450, 1454 (5th Cir. 1993); see also Freman, 503 U.S. at 492, 498.

1. Good faith compliance with the district court's orders

A school district seeking the termination of federal court supervision must first show that it has "consistently complied with a court decree in good faith." Hull, 1 F.3d at 1454; see also Freeman, 503 U.S. at 498 ("A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new de jure violation. . . ."). To meet this obligation, "[f]or at least three years, the school board must report to the district court." Monteilh v. St. Landry Parish Sch. Bd., 848 F.2d 625, 629 (5th Cir. 1988). Further, "the district in question must have for several years operated as a unitary system." Lemon v. Bossier Parish Sch. Bd., 444 F.2d 1400, 1401 (5th Cir. 1971).

Appellants make two related arguments concerning this prong. First, Appellants assert that the MCSD has not complied in good faith with the district court's orders, as evidenced by the MCSD's alleged failure to, inter alia, adequately support the magnet program and facilities at VJHS, construct an adequate music facility at Northeast Madison Middle School ("NMMS"), and to monitor minority hiring throughout the district. Second, Appellants argue that the district court erred in finding the MCSD unitary without first finding that it had been in compliance with desegregation orders for at least three years. According to Appellants, at the time the district court issued its Order, the MCSD had not yet completed several facilities projects, and had only recently completed others, indicating that the MCSD had not been in compliance for a reasonable amount of time.

Appellants correctly observe that the district court did not expressly state that the MCSD had been in compliance with its desegregation orders for at least three years. However, following its thorough review of the evidence, the district court found that the MCSD worked in good faith to comply with the 2000

consent order since its adoption in April 2000. The district court's finding that the MCSD has complied in good faith with the 2000 consent decree is "plausible in light of the record viewed in its entirety." See Price, 945 F.2d at 1312 (internal quotation marks omitted). For example, the MCSD's good faith compliance is illustrated by the fact it has devoted a considerable amount of resources to renovating VJHS and implementing a new magnet program there. It has also implemented procedures to recruit minority teachers, established a bi-racial advisory committee, and fulfilled its reporting obligation to the district court. Further, the MCSD's compliance with the 2000 consent order since its adoption constitutes compliance for a reasonable amount of time. See Lemon, 444 F.2d at 1401. Thus, we find no error in the district court's analysis of the first prong.

### 2. Elimination of the vestiges of prior de jure segregation to the extent practicable

Regarding the requirement that a school district eliminate the vestiges of prior de jure segregation to the extent practicable, "every reasonable effort [must] be made to eradicate segregation and its insidious residue," although complete racial balance is not required. Ross v. Houston Indep. Sch. Dist., 699 F.2d 218, 227-28 (5th Cir. 1983). Rather, the emphasis is on whether "the school district has done all that it could to remedy the segregation caused by official action." Price, 945 F.2d at 1314; see also United States v. Fordice, 505 U.S. 717, 728 (1992) ("[W]e have consistently asked whether existing racial identifiability is attributable to the State. . . ."). To guide courts in determining whether the vestiges of de jure segregation have been eliminated as far as practicable, the Supreme Court has identified several aspects of school operations that must be considered, commonly referred to as the Green factors: student assignment, faculty, staff, transportation, extracurricular activities, and facilities.[4] See Bd.

---

[4] Appellants conceded below that the MCSD has satisfied its obligations with regard to transportation and extracurricular activities.

of Educ. of Okla. City Pub. Sch. v. Dowell, 498 U.S. 237, 250 (1991) (discussing Green v. County Sch. Bd. of New Kent County, 391 U.S. 430, 435 (1968)).

### a. Student assignment

Student assignment within a school district is relevant to determining whether a school district has remedied, to the extent possible, the vestiges of prior de jure segregation. Dowell, 498 U.S. at 250. While racial imbalance in a particular school is relevant for that purpose, racial imbalance, without more, does not violate the Constitution. Cavalier ex rel. Cavalier v. Caddo Parish Sch. Bd., 403 F.3d 246, 260 (5th Cir. 2005). "Once the racial imbalance [in student assignment] due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors." Freeman, 503 U.S. at 494; Price, 945 F.2d at 1314 ("'[I]mmutable geographic factors and post-desegregation demographic changes that prevent the homogenation of all student bodies do not bar judicial recognition that the school system is unitary.'" (quoting Ross, 699 F.2d at 225)).

We note that the only objection Appellants appear to assert on appeal regarding student assignment is that the MCSD has allegedly failed to comply with court orders regarding the magnet program at VJHS and, as a result, the magnet program has failed to attract white students whose attendance would diversify that school and further eliminate the vestiges of prior segregation.[5]

---

[5] To the extent that Appellants may object to other aspects of student assignment within the MCSD, the record contains evidence sufficient to support a finding that the MCSD is unitary with respect to all aspects of student assignment. For example, the MCSD's expert, Dr. Rossell, noted that the MCSD "met or surpassed the original plan on all measures of racial balance and complies with the 1999 and 2000 court orders," and thus "has met the standard for unitary status on student assignment." We also note that none of the district court's orders established a racial quota for student assignment at each school and the presence of several schools in a district with a high percentage of students of a particular race does not preclude a finding of unitary status. See, e.g., Ross, 699 F.2d at 226-228 (upholding a declaration of unitary status when 55 of the school district's 226 schools had 90% or more African-American students).

VJHS, located in Zone I, traditionally has been a "one-race" school, and had a 98.5% African-American student population in 2005. To encourage white students living in different zones to attend VJHS, and to enhance VJHS's educational curriculum, the parties agreed in 1990 to implement a magnet program at the school. In the 2000-2001 school year, the MCSD implemented a new magnet program at VJHS, called Eco-Journeys. Despite the MCSD's efforts to develop and promote the magnet program, the parties agree that the program failed to draw a significant number of white students to VJHS. The Government and Private Plaintiffs argued below that the failure to attract white students to the magnet program at VJHS is attributable to the MCSD's lack of a good faith commitment to the magnet program. Thus, they argued, the MCSD was not entitled to a finding of unitary status on this aspect of student assignment. The district court disagreed and held that the MCSD complied in good faith with the 2000 consent order and that the program failed to attract white students primarily because of demographic and cultural factors.

On appeal, Appellants disagree with that conclusion and challenge the district court's findings that: (1) the implementation of the magnet program strengthened the curriculum at VJHS, (2) the magnet program had been adequately funded, (3) teacher inexperience at VJHS was not indicative of the MCSD's lack of good faith and did not affect the magnet program's success in attracting white students, (4) restructuring the administration at VJHS did not affect the magnet success in attracting white students, (5) the MCSD did not disregard known facilities deficiencies, and (6) no magnet program could attract white students to VJHS. In sum, Appellants claim that the district court erred by holding that the magnet program's inability to attract white students was attributable to demographic and cultural factors, as opposed to the deficiencies they alleged exist in the magnet program itself.

The evidence supports the district court's conclusion that location and demographic factors outside the MCSD's control, as opposed to the alleged inadequacies cited by Appellants, were responsible for the magnet program's failure to attract white students. With that in mind, we briefly review the Appellants' arguments regarding the magnet program.

First, Appellants argue that the magnet program weakened the curriculum at VJHS, contrary to the district court's assertion. Appellants cite nothing in the record, and we have found nothing, to support their contention. The magnet program at VJHS has received good reviews and the fact that VJHS may be rated lower than other schools, without more, simply does not lead to the conclusion that the magnet program has weakened the curriculum.[6] Additionally, evidence in the record supports the finding that, given VJHS's location, even an improved curriculum would not have made it successful in attracting white students.

Second, Appellants argue that the magnet program was inadequately funded, in large part because the MCSD sought no outside funds after receiving a federal grant in 1998. The record shows that the new magnet program was initially funded by a federal grant of over $2.3 million and that the MCSD spent an additional $1.5 million from 2000-2006, not counting general operational funding or funding for instructional supplies. Appellants fail to explain why the MCSD was required to seek further outside funding, and have presented no evidence that additional funds would have made a significant difference in the number of white students enrolling in the magnet program.

Appellants next argue that the inexperience of the teachers at VJHS demonstrates the MCSD's lack of good faith commitment to the magnet program and contributed to its failure to attract white students. The district court held

---

[6] We note that VJHS was rated a level three (successful) school in the No Child Left Behind report.

11

that the MCSD made reasonable efforts to attract more experienced teachers to VJHS, and that it did not act in bad faith by refusing to exercise its authority to force more experienced teachers from other schools in the district to transfer to VJHS, because such a measure would have been counterproductive. Appellants have not shown that the MCSD's decision to not implement forced transfers was motivated by anything other than practical concerns about losing teachers to other districts. Further, Appellants have not shown that more experienced teachers at VJHS would have attracted more white students, and given the geographic challenges facing the magnet program, such a proposition would be doubtful at best. Thus, we find no clear error on this point.

Relatedly, Appellants assert that the MCSD's restructuring of the administrative staff at VJHS affected the magnet program's success, contrary to the district court's finding. The restructuring at issue involved elimination of an administrative position located at the MCSD's central office and assigning control of the entire magnet program to VJHS's principal. The district court held that the restructuring reasonably consolidated several functions in one on-site position, and that this action did not affect the magnet program's success. Again, we find no clear error in this conclusion.[7]

Appellants next argue that an important factor contributing to the magnet program's failure to attract white students was the poor condition its facilities, at least prior to renovations in 2005.[8] The Government's expert, Dr. Gordon, reported that in January 2005 the physical facilities at VJHS were ill-equipped and in a state of general disrepair. Dr. Gordon conceded, however, that by the

---

[7] We note that Appellants' argument that this conclusion is erroneous because three VJHS principals were removed for incompetence is unpersuasive because it fails to establish any relationship between the removals and the implementation of the restructuring plan.

[8] To the extent that the condition of VJHS's facilities affected the success of the magnet program, it is relevant to the present discussion of the "student assignment" factor. We note that the condition of facilities is also its own Green factor, discussed infra.

12

time of the district court's hearing on the MCSD's motion, the MCSD had fixed many of the problems he previously noted and that VJHS's classrooms were comparable to those at other high schools in the district. Appellants do not appear to object to the current state of VJHS's classrooms. Instead, they argue that the MCSD disregarded known deficiencies in facilities prior to 2005 because it did not begin renovations until after Dr. Gordon issued his report in January 2005. They also contend that the athletic facilities at VJHS are substandard.

The district court acknowledged that, if the evidence showed that the MCSD disregarded known facilities' deficiencies, it likely would have failed in its duty to act in good faith to establish and maintain the magnet program. However, the court found that the evidence indicated that the facility was generally in good repair, and that no evidence supported the claim that the MCSD was aware or should have been aware of the problems cited by Dr. Gordon in his report. Further, the district court found that the alleged state of disrepair of the athletic facilities at VJHS did not play a significant role in the failure of the magnet program. We find that the evidence relied upon by the district court supports this conclusion.

Lastly, and most fundamentally, Appellants take issue with the district court's ultimate conclusion that "no matter the quality of the program, the facilities, the teachers, [and] regardless of how much money is spent, no magnet program is going to draw white students to [VJHS], at least not in numbers sufficient to affect the racial imbalance of the school." The district court thoroughly documented the MCSD's efforts to develop a successful magnet program, and based on its review, found that the failure of the program to attract white students was not attributable to the MCSD's actions or lack of good faith. Instead, the court found that the magnet program's goal of attracting white students was doomed because of location and cultural factors that were not attributable to the MCSD.

We find no error in these findings. The evidence confirms that the MCSD devoted considerable time and resources in a good faith effort to establish the magnet program. Moreover, the record also supports the conclusion that the magnet program's inability to attract white students resulted from VJHS's very inconvenient location.[9] Testimony confirmed that VJHS is geographically distant from the large number of students in Zone II, as well as from businesses and cultural opportunities. For example, the MCSD's superintendent testified that it is approximately forty miles between the schools in the south end of the MCSD and VJHS. Dr. Rossell, an expert for the MCSD, opined that while the magnet program may have succeeded at a different location, "I don't think there's any magnet program that could be designed that would overcome those issues, location, distance, and the difference in socioeconomic status."

In sum, the district court did not err in finding that the MCSD acted in good faith and that its efforts to implement a successful magnet at VJHS were reasonable. Moreover, any evidence that additional resources might have improved the alleged deficiencies in the magnet program must yield to the reality that the school's location presented an apparently insurmountable challenge to attracting white students. Given the evidence documenting this challenge and the evidence confirming the MCSD's substantial efforts to implement a successful magnet program, the district court's findings concerning the magnet program and student assignment are "plausible in light of the record

---

[9] In response to the district court's conclusion that the magnet failed because of location and demographic factors, Appellants argue that "accommodating the racial animus of white[s] is not a legitimate basis" to excuse the MCSD's duty to properly support the magnet program. This argument misses the mark. First, the district court held that the MCSD undertook good faith efforts to support the magnet program—not that it was excusing the MCSD's failure to support the magnet program. Second, the evidence indicates that the failure of the magnet program to attract white students was not about racial animus, it was about distance and a lack of nearby opportunities. Dr. Rossell acknowledged as much when she stated that the "magnet may have succeeded if it was located in a cosmopolitan area that provided cultural and work opportunities."

viewed in its entirety" and are not clearly erroneous. See Price, 945 F.2d at 1312 (internal quotation marks omitted).

b. Facilities

Another consideration in determining whether a school district has eliminated the vestiges of prior de jure segregation to the extent practicable is whether school facilities are adequate. Green, 391 U.S. at 435. Appellants argue that (1) facilities at VJHS were substandard prior to 2005, (2) that the baseball field and football stadium at VJHS do not compare favorably with others in the district, and (3) it is unacceptable that the music program at one primarily African-American middle school, Northeast Madison Middle School ("NMMS"), is housed in a portable building.[10]

The district court held that the challenged school facilities are adequate. The court noted that, of the four schools in Zone I, where VJHS is located, two are new and two have been renovated. Regarding athletic facilities, the district court noted that the MCSD was making improvements to VJHS's football stadium, and that while the VJHS baseball field was not as nice as others in the district, there was less interest in baseball at VJHS compared to other sports. Regarding the music program at NMMS, the district court pointed out that the school has a music room in the main building, but due to excessive noise, the principal moved the music program to portable buildings away from classrooms in order to avoid disturbance. The court acknowledged that the school's design

---

[10] Appellants also appear to argue that the facilities at the MCSD's Alternative School are inadequate because the school has no kitchen, it has no "real" classrooms, and elementary students are taught in a trailer. However, MCSD's superintendent, Michael Kent, testified that while the Alternative School has no kitchen, there is a dining hall and the school provides food prepared off-site for the students. Further, he testified that the Alternative School conducts classes in rooms that were once district offices, and that those rooms "lend themselves fairly well to [being] classrooms because of the size of a typical class." This unchallenged testimony permits a finding that the Alternative School facilities are adequate in those areas. Also, Appellants do not explain why a trailer is inadequate to conduct an elementary class at the Alternative School.

may have been flawed, but pointed out that the MCSD relied upon assurances from the architect that the same configuration had been used successfully at other schools. The court held that "[i]ndisputably, the alleged inadequacy of the music facility at [NMMS] is not a vestige of former segregation practices, nor a result of the District's inattention to the needs of the students at the school, and certainly not the product of intentional discrimination."

The court concluded: "The proof unequivocally shows that the [MCSD] has undertaken to address known relevant deficiencies at all its schools, and to provide adequate and proper educational facilities for all its students, both black and white." We find no error in these conclusions. First, it is undisputed that the MCSD was in the process of making improvements to the football facilities at VJHS prior to the district court's ruling. Additionally, although the record supports Appellants' claim that the VJHS baseball field pales in comparison to the one at Ridgeland High School, which is also in the MCSD, the record does not show that the baseball field at VJHS is inadequate. Further, a number of improvements to the Ridgeland High School baseball field were the result of private fund-raising efforts. Regarding the allegedly inadequate music facilities at NMMS, Appellants have failed to establish that the decision to move the music program from the main building to portables is a vestige of past discrimination.[11]

### c. Faculty and staff assignment and pay

Faculty and staff issues are also relevant under Green. Dowell, 498 U.S. at 250. In Singleton v. Jackson Municipal Separate School District, we announced several requirements for hiring and assigning faculty and staff in

---

[11] Relatedly, Appellants argue that the MCSD has discriminated in its use of sixteenth section loan funds. The district court held that in 2005, the MCSD approved a $630,000 loan, $400,000 of which went to fund improvements to the track and stadium at VJHS—a use selected by a parent group at VJHS. Based on our review, we simply find no clear error in the court's conclusion that the sixteenth section loan funds have not been used in a discriminatory manner.

schools under desegregation orders. See 419 F.2d 1211, 1217-18 (5th Cir. 1969) (en banc), rev'd in part sub. nom., Carter v. West Feliciana Parish Sch. Bd., 396 U.S. 290 (1969). Only two of the Singleton requirements are relevant here. First, a school must show that faculty and staff who work directly with children are assigned in such a manner that the racial composition of the faculty and staff would not indicate that the school is intended for either African-American or white students. Id. Second, "discrimination on the basis of race, color or national origin in the hiring, assignment, promotion, pay, demotion or dismissal of faculty members and administrative staff" is prohibited. Fort Bend Ind. Sch. Dist. v. Stafford, 651 F.2d 1133, 1138 (5th Cir. 1981) (discussing Singleton, 419 F.2d at 1217-18). We have made clear that these requirements do not establish an arbitrary racial quota. See id. at 1139.

The 2000 consent order required the MCSD to meet its Singleton obligation by ensuring that the faculty composition at each school in the district is within a 15% range of the district-wide ratio of African-American to white teachers. Appellants claim the MCSD has failed to satisfy its obligation and that this failure is due, in large part, the MCSD's unwillingness to exercise is power to force teachers to transfer. Appellants further contend that the MCSD's hiring is not centralized, making it difficult to monitor how many minorities apply for, and are considered, for teaching positions district-wide. Lastly, Appellants accuse the MCSD of paying minority administrators inequitably. The MCSD admits that it has failed to satisfy the required faculty ratio at VJHS, but claims it has expended its best efforts to bring more white teachers to the school. The MCSD explains that it has not forced teachers to transfer because that effort would be counterproductive and would lead to teachers leaving the district entirely. Further, the MCSD points out that in the 2005-2006 school year, the faculty at VJHS was 44% white, 47% African-American, and 8% other, a

composition that would not indicate that VJHS is intended for either African-American or white students.

The district court, having heard testimony from the MCSD's superintendent and its personnel director, concluded that "every principal is keenly" aware of Singleton's requirements and the requirements of the 2000 consent order as it relates to faculty hiring. The court also found that the only options to remedy the faculty assignment problem are forced faculty transfers or increased pay for faculty who agree to transfer. Regarding the first option, the court found the that MCSD's decision not to force teachers to transfer was reasonable, given the risk that the district would likely lose teachers to other districts under such a policy. Regarding the second option, the court noted that increased pay, beyond what is authorized by statute, is apparently prohibited by state law. Further, the district court concluded that the MCSD's method for determining administrator pay, including consideration of such factors as the size of the school, grade levels taught at the school, and experience, was rational and non-discriminatory.

The MCSD has not satisfied its requirement to ensure that the faculty composition at each school in the district is within a 15% range of the district-wide ratio of African-American to white teachers. However, the MCSD provided the district court with considerable evidence that each school is aware of its Singleton obligation and that it has worked aggressively to ensure that each of its schools is staffed with a diverse faculty. As to VJHS, we note that while falling short of the requirement of the 2000 consent decree, the faculty composition is, in fact, quite diverse. Furthermore, the MCSD has documented its extensive minority recruitment efforts, which includes recruiting at predominantly African-American colleges and universities in Mississippi. And there is no evidence that the MCSD's faculty and staff employment and assignment practices, or its compensation scheme for administrators, is

currently discriminatory or that the district did not adequately remedy the adverse effects of prior de jure segregation. See Stafford, 651 F.2d at 1140 (holding that Singleton requirements are satisfied if the district's current employment practices are non-discriminatory and in compliance with the Constitution and the adverse effects of any prior unlawful employment practices have been adequately remedied). Lastly, the MCSD's expert, Dr. Rossell, evaluated the available information and opined that the MCSD has met the standard for unitary status on this factor "because it has racially balanced its staff to the extent practicable and [is] comparable to the level of other districts that have attained unitary status." Based on the evidence in the record, the district court did not clearly err in finding the MCSD unitary regarding faculty and staff policies.

### III.

After its thorough review of the evidence, the district court ultimately concluded that the MCSD:

> [H]as met its constitutional obligation to eliminate the vestiges de jure segregation to the extent practicable and that it has shown a good faith commitment to and compliance with its desegregation orders and to the rights that were the impetus for the court's orders. The court thus concludes that unitary status has been achieved in all of the District's operations, so that further judicial oversight is neither required nor desirable.

Based on our review of the record, we find no clear error in these findings. We are also cognizant of the important interest in "[r]eturning schools to the control of local authorities at the earliest practicable date" in order to "restore their true accountability . . . . to the citizenry [and] to the political process." Freeman, 503 U.S. at 490; see Dowell, 498 U.S. at 247 ("From the very first, federal supervision of local school systems was intended as a temporary measure to remedy past discrimination.").

Lastly, we would like to recognize those who have contributed their substantial efforts—teachers, administrators, parents, citizens, and others—to the difficult task of transforming the MCSD from a district practicing de jure segregation to one that has remedied the adverse affects thereof to the extent practicable. With our compliments to those involved in bringing about this accomplishment, and having found no clear error in the district court's findings, we affirm.

AFFIRMED.

CARL E. STEWART, Circuit Judge, specially concurring:

I concur in the majority opinion and its affirmance of the district court's grant of the Madison County School District's motion for unitary status. I nonetheless write separately to highlight the significant and sensitive issues raised in this appeal.

When this lawsuit began in 1969, racial isolation of students was fostered by a de jure system of racial segregation. Indeed, Brown v. Board of Education, 347 U.S. 483 (1954), and its progeny were primarily concerned with rooting out racial isolation and the accompanying pernicious effects it has on children. Here, the district court concluded and our panel affirms that the Madison County School District has achieved unitary status even though it is undisputed that many black students, particularly those in Zone I, continue to attend schools that are racially isolated. Further, hundreds of black students who have exercised their prerogative not to attend racially isolated schools will no longer be able to do so once federal court supervision ends, and the majority-to-minority transfer program with it. While the record provides a detailed account of the many obstacles that prevent the existence of fully integrated schools—such as the confluence of the geography and demography in the district—the cruel irony is that racial isolation, albeit not as the product of de jure segregation, largely remains as foreboding and potentially deleterious as it was when federal court supervision began. Of course, this case is only the latest indication that despite the societal progress that has been made in dismantling systems of segregation, many of the concerns highlighted in Brown still remain as viable today as when that opinion was first authored.

Justice Kennedy recently observed: "This Nation has a moral and ethical obligation to fulfill its historical commitment to creating an integrated society that ensures equal opportunity for all its children." Parents Involved in Cmty.

Sch. v. Seattle Sch. Dist. No. 1, 127 S. Ct. 2738, 2797 (2007) (Kennedy, J., concurring). Despite the grant of unitary status, this commitment undeniably remains unfulfilled in Madison County.

Unquestionably, there have been substantial efforts on the part of the district and all the parties involved to create a unitary school district while also ameliorating the effects of the de jure segregation that was in place for so many decades. Moreover, it is encouraging that the school district avowed to the district court that even after unitary status is granted, it will remain committed to improving any disparities between the facilities at majority-black and majority-white schools and providing resources targeted at improving learning and teaching opportunities at Zone I and similarly-situated schools. I take these overtures to bespeak a continuing good faith effort on the part of the district to seek out creative and effective remedies that are designed at maximizing educational opportunities for all its students. Hopefully, the difficulties inherent in this challenge will not hinder the district from moving closer to fully meeting the promises of Brown.