# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————

No. 14-60542

———————

United States Court of Appeals
Fifth Circuit

**FILED**

October 30, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

>  Plaintiff-Appellee

v.

CYNTHIA FLETCHER, A minor, by Rev. Artis Fletcher, as next friend, and Gloria Jean Barnes and David Barnes, minors, by Rev. Theotis Smith, as next friend, suing in their own behalf and on behalf of all others similarly situated,

>  Intervenor-Plaintiff-Appellant

v.

STATE OF MISSISSIPPI,

>  Defendant

SIMPSON COUNTY SCHOOL DISTRICT,

>  Intervenor-Defendant-Appellee

————————————

Appeal from the United States District Court
for the Southern District of Mississippi

————————————

No. 14-60542

Before STEWART, Chief Judge, and BARKSDALE and PRADO, Circuit Judges.

CARL E. STEWART, Chief Judge:

This case involves a lengthy history of desegregation litigation between the United States, Intervenor-Defendant-Appellee Simpson County School District (the "District"), and Intervenors-Plaintiffs-Appellants (the "Intervenors"), a class representing current and future students attending the District's schools. In 2013, the District moved for unitary status in the only area of its school system remaining under federal supervision: faculty and staff assignments. The United States and the Intervenors objected. After a two-day hearing and post-hearing submissions, the district court denied unitary status based on the District's noncompliance with the court's desegregation order. Both the District and the Intervenors moved for reconsideration, and the district court denied both motions. The Intervenors now appeal the district court's order denying unitary status and order denying reconsideration. We conclude that the Intervenors lack standing to appeal and, therefore, DISMISS the Intervenors' appeal without regard to the merits.

I.

Although we do not reach the merits of the decisions below, a general overview of the history of this case is necessary to understand the narrow issue we resolve today. For over forty years, the District has been under a federal court order to desegregate its schools. In July 1970, the United States sued the State of Mississippi and several of its school districts, including the District, alleging each had violated the Fourteenth Amendment by operating school systems that discriminated based on race. On August 11, 1970, the district court entered its first desegregation order (the "1970 Order") approving a school desegregation plan and obligating the District to follow procedures designed to end discrimination in faculty and staff assignments, student

No. 14-60542

transfers, transportation, school construction and site selection, and school activities. The 1970 Order also required the District to submit bi-annual reports to the court, including, *inter alia*, information related to the racial composition of the District's students and teachers.

In June 1982, Intervenors Cynthia Fletcher, Gloria Barnes, and David Barnes, then minor students attending the District's schools, and their representatives filed a class action complaint against the District for failing to comply with the 1970 Order. The Intervenors alleged that the District had continued to maintain segregated schools by allowing white students to attend schools outside of their designated geographical zone thereby creating disproportionate ratios of black to white students within certain zones. The Intervenors also alleged that the District continued to discriminate in employment decisions, student discipline, and student placement in special education and gifted-student programs.

In August 1983, after negotiations between the United States, the Intervenors, and the District, the district court entered a second desegregation order (the "1983 Consent Decree") outlining further procedures the District was to follow to end discrimination in its schools. Notably, with respect to employment practices, the 1983 Consent Decree required the District to advertise available positions, use standard employment forms, use objective rating criteria to review applications and score interviewees, and offer available positions to the highest-scoring applicant regardless of race. The 1983 Consent Decree further required the District to provide the United States and the Intervenors with notice of any proposed change to the District's employment procedures at least sixty days before the District formally adopted the change. Finally, the 1983 Consent Decree broadened the District's bi-annual reporting requirements to include, *inter alia*, the racial composition of job applicants, new hires, and demoted, terminated, or non-renewed employees

3

and any action taken by the District that was inconsistent with the 1983 Consent Decree, "includ[ing], for example, any effort to hire or promote an individual who is not the most qualified person available for the position being filled."

In 2001, the District moved for unitary status for the first time since federal supervision began in 1970. The United States responded, only objecting to a declaration of unitary status in the area of faculty and staff assignments; the Intervenors did not respond or otherwise object. Absent an objection from the United States or the Intervenors and based on its independent review of the evidence, the district court granted unitary status in all areas except faculty and staff assignments. The court denied unitary status in faculty and staff assignments based on the District's acknowledgement that it had violated the 1983 Consent Decree regarding certain employment issues. This court affirmed the district court's decision on appeal. *United States v. Mississippi*, 211 F. App'x 296 (5th Cir. 2006).

On April 5, 2011, on the United States and the District's joint motion, and with no objection from the Intervenors, the district court entered a third desegregation order (the "2011 Consent Decree"), which generally embraced the employment procedures in the 1983 Consent Decree, but further specified the mechanics by which the District was to make employment decisions in several respects. Under the 2011 Consent Decree, the District's Human Resources Director was required to review and numerically score written job applications based on certain objective criteria. The District's Superintendent or a school's principal was required to interview the highest-scoring applicant as well as any other "applicant[] with a score higher than that of the lowest-scoring applicant selected for an interview," unless certain exceptions applied. Interviewed applicants received a second numerical score based on certain subjective criteria. The subjective interview score was added to the objective

application score, and the District was required to offer the position to the applicant with the highest composite score unless "a legitimate negative reason exists not to hire the applicant."[1]

Before the District offered a position to a lower-scoring applicant, it was required to provide the United States and the Intervenors with all application materials related to the position in question and a statement explaining why the District had chosen not to offer the position to the highest-scoring applicant. The United States and the Intervenors could then object in writing.[2] In the absence of a written objection, the District's decision to hire the lower-scoring applicant became final. However, if the United States or the Intervenors timely objected, the District was required to provide the United States and the Intervenors with the opportunity to object in the district court.

In November 2011, the United States moved to enjoin the District from violating the terms of the 2011 Consent Decree, alleging that, on at least nineteen occasions, the District had hired individuals that were not the highest-scoring applicant without providing the United States with an opportunity to object. In January 2012, the district court granted the motion based on the District's admission that it had not satisfied the notice

---

[1] The 2011 Consent Decree provides some examples of "legitimate reasons" for the District not to hire the highest-scoring applicant: "Such a negative reason would exist, for instance, if upon checking references the applicant receives negative comments such as needing improvement or unacceptable performance, if the applicant has provided false or misleading information about his or her certifications or about any other information on the job application, if the applicant does not satisfy the criminal background/child abuse registry check required by state law, or if the applicant has been terminated or non-renewed for good cause from any previous job or position. The District may not, however, fail to hire the highest overall-rated applicant only because it favors a lower-rated applicant."

[2] The Intervenors could also object to the District's hiring of a highest-scoring applicant if that applicant did not also have the highest objective application score.

requirements in the 2011 Consent Decree. The district court extended the term of the 2011 Consent Decree to October 15, 2012.[3]

On January 30, 2013, the District moved for unitary status in the remaining area of faculty and staff assignments. The United States did not object. Despite a long absence from the litigation, the Intervenors filed an objection challenging whether the District had complied with court orders and seeking discovery and a public hearing. The district court denied the Intervenors' discovery requests but granted the Intervenors' request for a hearing. Several days later, the court entered an order setting a hearing on the District's motion, outlining the requirements for providing notice of the hearing to the community, and establishing a process for community members to submit objections to the District's motion.

During the public objections period, the district court received over 500 objections to the District's motion. A large number of these objections were generic in form or merely stated "I object." However, some objectors detailed specific hiring or termination incidents and were permitted to testify to those incidents over the course of a two-day fairness hearing in January 2014. At the conclusion of the fairness hearing, the court held the District's motion in abeyance pending the filing of proposed findings of fact and conclusions of law by the United States, the Intervenors, and the District. In these filings, both the United States and the Intervenors requested, *inter alia*, that the court

---

[3] At oral argument, counsel for the District made several confounding statements suggesting that the district court entered a new consent decree in 2012 and that this "2012 Consent Decree" is at issue in this appeal. As counsel later clarified, the district court's January 2012 order merely extended the term of the 2011 Consent Decree without alteration or modification. *See* Opinion and Order at 3, *United States v. Mississippi*, No. 3:70-cv-4706-WHB-LRA (S.D. Miss. Jan. 10, 2012), ECF No. 48 ("The term of the Consent Decree entered by the Court on April 5, 2011, is hereby extended up to and including October 15, 2012." (internal citation omitted)).

No. 14-60542

appoint an independent monitor to oversee the District's compliance with the 2011 Consent Decree.

On April 30, 2014, the district court denied unitary status based on the District's failure to comply with the 2011 Consent Decree, citing, as one example of noncompliance, the District's modification of its Interview Guide and Assessment forms without first providing the United States and the Intervenors with notice of the proposed change. The court therefore extended the 2011 Consent Decree to March 15, 2015, at which time the District could again move for unitary status.[4] The court denied as unwarranted the Intervenors' and the United States' requested amendments to the 2011 Consent Decree, including the request for a court-appointed monitor.

The District and the Intervenors each moved for reconsideration of the district court's order denying unitary status. The District argued that only the employment provisions of the 2011 Consent Decree that the court found the District to have violated should be extended and requested that the court limit future objections to unitary status to that basis. The Intervenors challenged the court's legal analysis and evidentiary determinations. The court disagreed with both parties' contentions and denied the motions for reconsideration.

The Intervenors timely appealed the district court's order denying unitary status and order denying reconsideration.[5]

II.

Ordinarily, our review of this appeal would be guided by well-established desegregation principles. Following the Supreme Court's decisions in *Brown I* and *Brown II*, school districts were charged with an "affirmative duty to . . .

---

[4] After this court heard oral arguments, the District again moved for full unitary status on September 17, 2015. Soon thereafter, the district court stayed the District's motion pending our resolution of this appeal.

[5] The United States is not a party to this appeal.

convert" their segregated education systems into "a unitary system in which racial discrimination would be eliminated root and branch." *Green v. Cty. Sch. Bd. of New Kent Cty., Va.*, 391 U.S. 430, 435–38 (1968). This affirmative duty, and the federal court supervision it required, was not intended to exist in perpetuity. *See Bd. of Educ. of Okla. City Pub. Sch., Indep. Sch. Dist. No. 89, Okla. Cty., Okla. v. Dowell*, 498 U.S. 237, 247–48 (1991). Instead, "the ultimate objective . . . [is] to return school districts to the control of local authorities . . . [once] shown that the school district has attained the requisite degree of compliance." *Freeman v. Pitts*, 503 U.S. 467, 489–90 (1992).

"The ultimate inquiry in determining whether a school district is unitary is whether (1) the school district has complied in good faith with desegregation orders for a reasonable amount of time, and (2) the school district has eliminated the vestiges of prior *de jure* segregation to the extent practicable." *Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292, 297 (5th Cir. 2008) (footnote omitted). The compliance prong requires a school district to show that it has consistently complied with the court's desegregation orders in good faith. *Id.* A school district has eliminated the vestiges of past discrimination to the extent practicable when it has made "every reasonable effort . . . to eradicate segregation and its insidious residue." *Id.* at 298 (quoting *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 227–28 (5th Cir. 1983)).

To demonstrate that it is unitary with respect to faculty and staff assignments, a school district must establish that its "current employment practices [are] non-discriminatory and in compliance with constitutional standards" and that "the adverse effects of any earlier, unlawful employment practices . . . have been adequately remedied." *Fort Bend Indep. Sch. Dist. v. City of Stafford*, 651 F.2d 1133, 1140 (5th Cir. 1981). This court has also required a showing that the racial composition of a school's faculty and staff does "not indicate that the school is intended for either African-American or

white students." *Anderson*, 517 F.3d at 303. We have cautioned, however, "that these requirements do not establish an arbitrary racial quota." *Id.*

Notwithstanding these desegregation guideposts, this case comes before us with an unusual procedural posture—the Intervenors, not the District, appeal the district court's denial of unitary status. *See, e.g.*, *E.E.O.C. v. Chi. Club*, 86 F.3d 1423, 1431 (7th Cir. 1996) ("It is unusual, although not impermissible, for a party to appeal from a judgment in which it prevailed."). This wrinkle raises the "threshold question" of whether the Intervenors have standing to appeal the district court's favorable rulings. *Zente v. Credit Mgmt., L.P.*, 789 F.3d 601, 603–04 (5th Cir. 2015).

"It is a central tenet of appellate jurisdiction that a party who is not aggrieved by a judgment of the district court has no standing to appeal it."[6] *Ward v. Santa Fe Indep. Sch. Dist.*, 393 F.3d 599, 603 (5th Cir. 2004). "A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 333 (1980); *cf. Forney v. Apfel*, 524 U.S. 266, 271 (1998) ("[T]his Court also has clearly stated that a party is 'aggrieved' and ordinarily can appeal a decision 'granting in part and denying in part the remedy requested.'" (quoting *United States v. Jose*, 519 U.S. 54, 56 (1996) (per curiam))). Moreover, because appellate courts review judgments, not opinions, *see Ward*, 393 F.3d at 603, "[a] party may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." *Roper*, 445 U.S. at 335 (quoting *Elec. Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242

---

[6] This "rule is one of federal appellate practice, however, derived from the statutes granting appellate jurisdiction and the historic practices of the appellate courts; it does not have its source in the jurisdictional limitations of Art. III." *Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 333–34 (1980).

(1939)); *see also Mathias v. WorldCom Techs., Inc.*, 535 U.S. 682, 684 (2002) (per curiam).

However, a prevailing party has standing to appeal if he can demonstrate that he was aggrieved by a favorable judgment. *Ward*, 393 F.3d at 603–04. "Courts have recognized a handful of situations in which a party may be sufficiently aggrieved by a favorable judgment to appeal it, such as where the judgment itself contains prejudicial language on issues immaterial to the disposition of the case, where collateral estoppel may harm the party in future proceedings, or where the party will suffer financial loss as a result of the judgment." *Conwill v. Greenberg Traurig, L.L.P.*, 448 F. App'x 434, 436–37 (5th Cir. 2011) (collecting cases). Similarly, courts have permitted prevailing parties to appeal unfavorable findings that may have an adverse future effect. *See Camreta v. Greene*, 131 S. Ct. 2020, 2030–33 (2011) (holding, in the limited context of qualified immunity, that a prevailing party may challenge an adverse finding that has a "significant future effect on the conduct of public officials"); *but see Mathias*, 535 U.S. at 684 (dismissing prevailing parties' appeal seeking review "of uncongenial findings not essential to the judgment and not binding upon them in future litigation").

Neither party to this appeal raised the issue of the Intervenors' appellate standing in their initial briefs. The court *sua sponte* raised the issue and ordered the parties to file supplemental briefing addressing "whether and on what ground(s) Plaintiffs-Intervenors have standing to appeal the district court's denial of unitary status." In their supplemental brief, the Intervenors contend that they have standing to appeal because the district court's orders did not afford them with the complete relief requested and contain findings

No. 14-60542

and language that adversely affect them in future unitary proceedings. We address each of these arguments in turn.[7]

### A.

The Intervenors first contend that they have standing to appeal because the district court's April 30 order did not afford them all of the relief they requested. The district court granted the Intervenors' principal request—a denial of unitary status—but denied their additional requests that the District remain under court supervision for two years and that the 2011 Consent Decree be amended to provide for a court-appointed consultant responsible for monitoring the District's employment practices.

In the ordinary case, the district court's decision to afford the Intervenors with some, but not all, of the relief requested might well be sufficient to allow the Intervenors to appeal. *See, e.g.*, *Forney*, 524 U.S. at 271–72. However, the Intervenors have not challenged the district court's denial of this additional relief on appeal. The Intervenors make no mention of the additional relief in their initial brief. Moreover, in their supplemental brief directed at the issue of standing, the Intervenors make no argument that the district court erred in denying the additional relief. The Intervenors may not rely on this requested relief to establish standing when they have not challenged the district court's denial on appeal. *Cf. id.* at 271 (allowing a prevailing party that received "some, but not all, of the relief she requested" to appeal a lower court's order "*insofar as it denies her the relief she has sought.*" (emphasis added)). Were we

---

[7] As a preliminary matter, we note that the Intervenors make no argument that the district court's order denying reconsideration provides a basis for standing separate and apart from the court's order denying unitary status. Accordingly, the Intervenors have waived any such argument. *See, e.g.*, *T.L. James & Co. v. Traylor Bros., Inc.*, 294 F.3d 743, 750 (5th Cir. 2002) ("It is well-settled that when a party fails to brief an issue, it cannot be considered on appeal."). The Intervenors' standing arguments focus exclusively on the district court's order denying unitary status, and our analysis will do the same.

No. 14-60542

to conclude otherwise, we would be placed in the untenable position of reviewing the district court's decision to deny the Intervenors additional relief absent any argument from the Intervenors as to why that relief was warranted. Accordingly, we decline to hold that the Intervenors have standing to appeal on this basis.

B.

The Intervenors next contend that they have standing to appeal because the district court's April 30 order adversely affects them in future unitary proceedings. Specifically, the Intervenors contend that the district court necessarily concluded that the District had eliminated the vestiges of *de jure* segregation; limited its holding as to the District's non-compliance with court orders to the narrow employment forms violation identified in the April 30 order; and precluded the Intervenors from raising certain objections and evidence in future unitary proceedings. Essentially, the Intervenors contend that certain language in the district court's order, viewed in isolation and left open to interpretation, could conceivably be conclusive or collaterally estop them in the future and would, in turn, adversely affect their ability to challenge future motions for unitary status. We disagree.

Our review of the Intervenors' contentions must begin with the axioms that appellate courts review judgments, not opinions, *see, e.g.*, *Ward*, 393 F.3d at 603, and that a party may not appeal a favorable ruling "for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." *Roper*, 445 U.S. at 335 (quoting *Elec. Fittings*, 307 U.S. at 242). Here, the Intervenors do not appeal from any judgment of the district court; rather, they challenge an interlocutory order that unequivocally denies unitary status. Even then, the Intervenors wisely do not challenge the interlocutory order's favorable outcome. Instead, the Intervenors acknowledge that their principal dissatisfaction lies with the district court's explanation for

12

denying unitary status.[8]  Although the challenged statements may be less than friendly to the Intervenors, they are not essential to the court's denial of unitary status, and, as we explain today, we see no reason to conclude that they will have any preclusive or adverse effect in the future.[9]  It is well-established that the Intervenors may not appeal for the sole purpose of seeking a more favorable opinion from the district court.  *See, e.g.*, *Ward*, 393 F.3d at 603–04 (collecting cases and concluding that "because the plaintiffs are not seeking a modification of the judgment but only a modification of the opinion, they have no standing to appeal").

The Intervenors contend that they have standing to appeal based on a number of cases, each of which is inapposite.  In *Electrical Fittings*, the district court entered judgment for the defendant based on non-infringement of the

---

[8] The Intervenors' arguments on appeal focus on isolated statements in the district court's order denying unitary status.  *See* Opinion and Order at 10, *United States v. Mississippi*, No. 3:70-cv-4706-WHB-LRA (S.D. Miss. April 30, 2014), ECF No. 196 ("The Court additionally finds that the District has shown, by the preponderance of the evidence, that it has eliminated the vestiges of prior *de jure* segregation to the extent practicable."); *id.* ("[U]nitary status must nevertheless be denied because the District has not shown that it has fully complied with the express terms of the 2011 Consent Decree.  For example, under the terms of the 2011 Consent Decree, the District is not permitted to modify any of the Interview Guide and Assessment Forms . . . without first providing the [United States] and Intervenors a written description of the proposed changes . . . ."); *id.* at 14 ("Any objections to unitary status would need to be based on actions or decision taken by the District during the time period following the January 2014 fairness hearing.").

[9] In their supplemental brief, the Intervenors repeatedly express a fear that language in the district court's order denying unitary status may collaterally estop them in future unitary proceedings, but make little, if any, attempt to explain how this fear may come to fruition.  We see no basis to conclude that nonessential matters resolved in the district court's order denying unitary status could collaterally estop the Intervenors in the future.  *See, e.g., Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 546 (5th Cir. 2009) ("[A]n interlocutory ruling will only have collateral estoppel effect in subsequent litigation if the ultimate judgment in the case was dependent upon the interlocutory ruling."); *see also* 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4402 (2d ed. 2015) ("It is insufficient for the invocation of [collateral estoppel] that some question of fact or law in a later suit was relevant to a prior adjudication between the parties; the contested issue must have been litigated and necessary to the judgment earlier rendered.").

plaintiff's patent, but found that the patent itself was valid. *See* 307 U.S. at 241–42. The appellate court dismissed the appeal, concluding that the erroneous finding of patent validity was nonessential to the judgment and would not estop the defendants in the future. *Id.* at 242. The Supreme Court reversed, reasoning that the finding of patent validity, "though . . . immaterial to the disposition of the cause, [stood] as an adjudication of one of the issues litigated." *Id.* Thus, "the petitioners were entitled to have this portion of the decree eliminated," and the appellate court should have "entertain[ed] the appeal, not for the purpose of passing on the merits, but to direct the reformation of the decree." *Id.*

*Electrical Fittings* is distinguishable from this case in that, here, the Intervenors ask the court to reform statements in an interlocutory order rather than explanations that appear on the face of a judgment. *See In re DES Litig.*, 7 F.3d 20, 25 (2d Cir. 1993); *see also Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 546 (5th Cir. 2009); *Envtl. Prot. Info. Ctr., Inc. v. Pac. Lumber Co.*, 257 F.3d 1071, 1075 (9th Cir. 2001) (citing *Elec. Fittings*, 307 U.S. at 242, and stating "[w]e have, however, strictly interpreted 'decree' to mean 'judgment'"). Moreover, the Intervenors do not ask the court to revisit any issue necessarily litigated and decided against them in the interlocutory ruling at issue.[10] *See Roper*, 445 U.S. at 335 n.7. Rather, the Intervenors ask the court to entertain their appeal for the sole purpose of

---

[10] The *Electrical Fittings* Court was not at all clear as to its reasons for allowing the prevailing party to appeal. *See Elec. Fittings*, 307 U.S. at 242. In *Roper*, the Court clarified the *Electrical Fittings* holding, noting that the petitioners there were allowed to appeal the district court's error "because there had been an adverse decision on a litigated issue, they continued to assert an interest in the outcome of that issue, and for policy reasons this Court considered the procedural question of sufficient importance to allow an appeal." *See Roper*, 445 U.S. at 335 n.7.

revisiting ancillary reasoning and language with which they disagree. *Electrical Fittings* does not require this court to indulge such a request.

The plaintiffs also rely on *Deposit Guaranty National Bank, Jackson, Mississippi v. Roper*, 445 U.S. 326 (1980). In that case, the Court allowed class-action plaintiffs to appeal the district court's denial of class certification notwithstanding the court's judgment in the plaintiffs' favor. *See id.* at 327–31, 334. The Court highlighted the plaintiffs' ongoing interest in shifting legal expenses to other class litigants and held that "[i]n an appropriate case, appeal may be permitted from an adverse ruling collateral to the judgment on the merits at the behest of the party who has prevailed on the merits, so long as that party retains a stake in the appeal satisfying the requirements of Art. III." *Id.* at 334 & n.6; *see also Camreta*, 131 S. Ct. at 2030 (citing *Roper*, 445 U.S. at 336 n.7, and stating "[o]n the few occasions when we have departed from [the principle that appellate courts review judgments, not opinions], we have pointed to a policy reason . . . of sufficient importance to allow an appeal by the winner below" (internal alteration, citation, and quotation marks omitted)); *In re DES Litig.*, 7 F.3d at 25 n.5. Here, the Intervenors make no argument that the district court's rulings affect the financial consequences of the litigation and have not identified any other legitimate policy reasons for allowing an appeal at this stage of the litigation. Thus, the Intervenors have not established why standing is appropriate under *Roper*.

Nor can the Intervenors show standing under *Aetna Casualty & Surety Co. v. Cunningham*, 224 F.2d 478 (5th Cir. 1955). There, plaintiff sought to recover from defendant on two separate claims—fraud and indemnification. *Id.* at 479. The district court entered judgment for the plaintiff on the indemnification claim but ruled against the plaintiff on the fraud claim. *Id.* Despite receiving a favorable ruling, this court allowed the plaintiff to appeal based on the plaintiff's assertion that a judgment on the alternative fraud

claim would be more preferable in bankruptcy. *Id.* at 480. In so concluding, we noted "judgment[s] may have different qualities and legal consequences dependent on the claim on which it is based" and highlighted the reality that the indemnification and fraud claims were "separate and distinct." *Id.* We went on to hold "that when, as a practical matter, the denial of any one claim results in the plaintiff not getting the relief to which it claims to be entitled, whether in the amount or in the quality of the judgment, it has a right to be heard on appeal." *Id.* at 480–81.

The Intervenors contend that *Aetna* provides standing in this case because the Intervenors raised a number of "separate and distinct" violations of the 2011 Consent Decree before the district court and "in essence, the District Court ruled against Plaintiff-Intervenors on all but the issue of use of forms." Thus, the Intervenors contend, "[t]he District Court's opinion and order is adverse to Plaintiff-Intervenors on the other violations raised."

We disagree with the Intervenors' reading of the district court's April 30 order. In discussing the District's non-compliance with the 2011 Consent Decree, the district court used the phrase "for example," which indicates that the court's conclusion was not based upon the one violation discussed. *See, e.g.*, The American Heritage Dictionary of the English Language 637 (5th ed. 2011) (defining "example" as "[o]ne that is representative of a whole" and "for example" as "[a]n illustrative instance"). By citing only one illustrative example of the District's non-compliance in the April 30 order, the district court did not rule against the Intervenors as to all but the specific violation referenced, limit the scope of future unitary proceedings, or otherwise dilute

the quality of the decision the Intervenors received—a denial of unitary status.[11] Thus, *Aetna* is of no moment.

At oral argument, counsel for the Intervenors stated that *Department of Defense, Office of Dependents Schools v. Federal Labor Relations Authority*, 879 F.2d 1220 (4th Cir. 1989), was the best case in support of the Intervenors' standing argument. *Department of Defense* involved a procedural framework that is not applicable to the situation here. *See id.* at 1221. Moreover, the Intervenors' reliance on the Fourth Circuit's analysis is otherwise unavailing. There, the Fourth Circuit held that an agency had standing to appeal a favorable dismissal based on an adverse legal premise underlying the dismissal—that the agency's head had no power to review and disapprove of certain collective bargaining agreements. *Id.* at 1220–22. The court specifically noted that, if the agency was denied standing to appeal, it would be harmed to the extent it had to suffer a long appeals process before it could seek judicial review of the adverse legal premise. *Id.* at 1221–22. In a practical

---

[11] The district court's treatment of the District's motion for reconsideration further supports our conclusion that the court did not implicitly rule against the Intervenors as to all but the specific violation referenced or otherwise limit the scope of future unitary inquiries. On reconsideration, the District requested that the court limit future unitary inquiries to the specific employment forms issue identified in the court's order denying unitary status. The court denied this request, reasoning that:

> As understood by the Court, Fifth Circuit precedent requires that the District comply, in good faith, with all of the terms of the 2011 Consent Decree for a reasonable amount of time before it can be declared unitary in the areas of faculty and staff assignments. The District has not, to date, satisfied this burden, and has been given another opportunity to show that it can, and will, abide by the Orders of this Court as written. Accordingly, because the Court does not believe the District can satisfy the necessary burden of proof for obtaining unitary status through piecemeal compliance, the Court finds no basis for either reconsidering or clarifying the Opinion and Order by which the Motion for Unitary Status was denied.

*See* Opinion and Order at 5–6, *United States v. Mississippi*, No. 3:70-cv-4706-WHB-LRA (S.D. Miss. July 8, 2014), ECF 204 (emphasis in original).

sense, the court held that this meant that the agency was "aggrieved" so as to have standing to appeal. *See id.*

The Intervenors contend that *Department of Defense* is analogous here because the district court's April 30 order rejected the Intervenors' proof of the District's violations of the 2011 Consent Decree beyond the specific violation referenced and limited future objections to unitary status to violations occurring after the January 2014 fairness hearing. Based on this interpretation, the Intervenors contend that the April 30 order could preclude appellate review of the district court's evidentiary determinations as to pre-2014-fairness-hearing violations. Again, we disagree.

Based on our reading and counsel for the District's representations at oral argument, we do not interpret the district court's April 30 order as foreclosing the Intervenors from offering evidence of pre-fairness hearing violations in future unitary proceedings, otherwise limiting the scope of future unitary proceedings, or barring appellate review of the district court's evidentiary determinations. As counsel for the District conceded at oral argument, we expect that the Intervenors will have a full and fair opportunity in future unitary proceedings to offer evidence that the District has failed to eliminate the vestiges of *de jure* segregation or to comply in good faith with the court's desegregation order, whether that evidence be based on alleged violations considered at the January 2014 fairness hearing or occurring thereafter. Should the district court reject the Intervenors' evidence and grant unitary status at some time in the future, this court will remain open to hear the Intervenors' appellate arguments, including those, if appropriate, that challenge determinations made in the April 30 order. For now, however, we decline to accept the Intervenors' invitation to jumpstart the appellate process in the face of the district court's order unequivocally denying unitary status.

No. 14-60542

III.

Having considered the Intervenors' arguments, we conclude that they are not sufficiently aggrieved and therefore lack standing to appeal the district court's orders.  We therefore DISMISS the Intervenors' appeal without regard to the merits.